Naomi MARQUEZ, Plaintiff–Appellant,

v.

SCREEN ACTORS GUILD, INC., and Lakeside Productions, Inc., a foreign corporation, Defendants–Appellees.

No. 96–35566.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 7, 1997.

Decided Aug. 29, 1997.

---

1. Hyde has also raised additional issues, which we will dispose of in a memorandum disposition.

Raymond J. LaJeunesse, Jr., National Right to Work Legal Foundation, Inc., Springfield, VA, for plaintiff-appellant.

Leo Geffner, Geffner & Bush, Burbank, CA, for defendant-appellee Screen Actors Guild, Inc.

Earle J. Hereford, Jr., Seattle, WA, for defendant-appellee Lakeside Productions.

Before: REAVLEY,* O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether the Screen Actors Guild breached its duty of fair representation when it refused to clear a part-time actress for work because she could not prepay full union dues.

---

* The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

## I

Naomi Marquez is a part-time actress, represented by agents Scott Thompson and Ingrid Fuhriman at the Thompson Media Talent agency. Lakeside Productions ("Lakeside") is the producer of a television series called "Medicine Ball," and is an employer within the meaning of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(2) (1988). Heidi Walker of Dixon/Walker Casting ("Dixon/Walker"), was hired by Lakeside to serve as the casting director for the "Medicine Ball" project.

The Screen Actors Guild ("SAG" or "the union") is a labor organization within the meaning of the NLRA. *See* 29 U.S.C. § 152(5). SAG was the exclusive bargaining agent for performers working for Lakeside on the "Medicine Ball" series.

Lakeside and SAG entered into a collective bargaining agreement ("CBA") which included a union security term providing that any actor who had previously worked more than 30 days in the motion picture industry was required to be "a member of the Union in good standing" and to pay periodic dues and initiation fees. To assure compliance with the CBA, Lakeside was required to call in the names of all performers for clearance by "Station 12," a regional division of SAG. SAG then informed the producers of each employee's dues obligations to the union and whether or not they were cleared to work in the performance.

On August 29, 1994, Marquez successfully auditioned for a small role in Lakeside's "Medicine Ball" series, and accepted the offer. Dixon/Walker, as the casting director and in keeping with its normal procedure, called in Marquez's name for clearance with Station 12. Marquez had previously worked for more than 30 days in the motion picture industry: five years earlier, in 1989, she worked more than 30 days on a movie that was covered by a SAG agreement. This 1989 employment triggered the union security term in the CBA, and Marquez was now required by the CBA to pay union initiation fees and dues to SAG.

There is a dispute over whether Station 12 informed Dixon/Walker that Marquez "must join" SAG, or whether the words used were "must pay" SAG, before she would be eligible to work in the production. Regardless of the term used, Marquez understood that she was required to pay SAG before she would be eligible to work. She called the Seattle SAG office to inquire into the cost of joining the union, and was told that the fee was about $500. She would receive $550 for her work in the production, to be paid 30 days after her performance. Marquez told her agents that she could not afford to pay the fee before being paid for the job. Her agents, Thompson and Fuhriman, said they would attempt to work something out.

Ingrid Fuhriman made several phone calls on Marquez's behalf to Lakeside, Dixon/Walker and SAG over the next few days. She called SAG headquarters in Los Angeles to try to work out an arrangement. Fuhriman asked whether Marquez could pay the fees after being paid by Lakeside, as she could not afford to pay ahead of time. An unidentified SAG employee in the membership department said that this would not be possible, and that Marquez must pay before being cleared for work. It was also suggested that if Marquez could not pay in advance she could have up to 14 days after filming to pay. The SAG employee said that it would not be possible to wait the 30 days that it would take to be paid for the acting job, nor to agree simply to sign over her check to SAG. Fuhriman next spoke with Vicki Shapiro, SAG's legal counsel, who verified this information. Shapiro further testified that Fuhriman did not mention Marquez by name, nor say that Marquez objected to joining the union.

Marquez then contacted Hugh Reilly at the National Right to Work Legal Defense Foundation. He drafted a letter explaining that, under federal law, Marquez could not be required to join a union as a condition of employment, that SAG could only require that she pay a pro-rated share for services provided to all workers,[1] and that she was entitled to a 30–day grace period before any

---

1. In its notice to fee-paying non-members, SAG informs those who decline union membership that they must pay 97.2% of the full union dues to cover representational services.

fees could be required. A draft of this letter was sent to Thompson Media on September 2nd, and was later faxed to Dixon/Walker on September 6. Lakeside also received a copy of the letter, which it faxed to SAG on September 7.

September 7th was also the day before Marquez was to perform in the production, and the deadline established by Station 12 for Marquez to pay the union dues. As she had not paid by the deadline, Lakeside hired another performer to replace her, and filming took place on the 8th. That same day, Vicki Shapiro, SAG's legal counsel, faxed a letter to Lakeside saying that it had no objection to Marquez working in the production. This letter arrived too late to be of assistance to Marquez, who lost the job.

Marquez filed suit against SAG and Lakeside in December, 1994. First, Marquez claimed that SAG breached its duty of fair representation owed to all workers covered by the agreement when it negotiated and enforced a CBA requiring more from employees than federal law permitted by: (1) requiring membership in the union; (2) demanding full payment of union dues of Marquez, rather than informing her of her right to pay a lesser "core" amount; and (3) and by failing to grant a 30 day grace period for each period of employment.

Secondly, she claimed that SAG and Lakeside breached "implied terms" from federal law which are implicitly part of all CBAs. Lakeside and SAG breached these terms, according to Marquez, in negotiating and enforcing the union security term. She requested declaratory, injunctive, and monetary relief under both claims, as well as attorneys fees. The district court granted summary judgment to the defendants and Marquez filed this timely appeal.

## II

■ As an exclusive bargaining representative of all employees in a bargaining unit, a union has a "statutory duty fairly to represent all of those employees" in the negotiation and enforcement of a collective bargaining agreement. *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967).

This duty is enforceable by courts, even if the alleged breach arguably could be considered an unfair labor practice under NLRA § 8(b)(1)(A) and therefore otherwise under the exclusive jurisdiction of the NLRB. *See Communications Workers of America v. Beck,* 487 U.S. 735, 743, 108 S.Ct. 2641, 2647, 101 L.Ed.2d 634 (1988).

■ The duty of fair representation has been likened to a fiduciary duty owed by the union to all employees "to represent them adequately as well as honestly and in good faith." *Air Line Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, 75, 111 S.Ct. 1127, 1133, 113 L.Ed.2d 51 (1991). The duty applies to "challenges leveled not only at a union's contract administration and enforcement efforts but at its negotiation activities as well." *Beck,* 487 U.S. at 743, 108 S.Ct. at 2647 (internal citation omitted).

■ A union breaches the duty of fair representation when "a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916. The Supreme Court has enunciated a highly deferential standard for reviewing the substantive results of a union's negotiation efforts, which should be evaluated "in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made." *O'Neill,* 499 U.S. at 78, 111 S.Ct. at 1135.

> [T]he final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a 'wide range of reasonableness' ... that it is wholly 'irrational' or 'arbitrary.'

*Id.* (internal citation omitted).

Marquez argues that SAG breached its duty of fair representation by negotiating and entering into a CBA with two unlawful terms: the union security clause and a 30–day term. Each contention will be dealt with in turn.

## A

■ SAG and Lakeside entered into a collective bargaining agreement ("CBA") with a union security term which provides: "Every

performer hereafter employed by any Producer ... shall be a member of the Union in good standing."[2] Marquez contends that the union acted arbitrarily and in bad faith in negotiating this term because unions may not legally require full union membership as a condition of employment. We disagree.

The NLRA by its very terms allows the inclusion of a union security term requiring union "membership." At the same time, the concept of "membership" in CBAs has become a term of art: unions can require no more than payment of initiation fees and dues covering a "financial core" of services provided to all employees. *See NLRB v. General Motors Corp.,* 373 U.S. 734, 742, 83 S.Ct. 1453, 1458, 10 L.Ed.2d 670 (1963). This core amount is limited to expenditures germane to "collective bargaining, contract administration, and grievance adjustment." *Beck,* 487 U.S. at 745, 108 S.Ct. at 2648.

First, § 8(a)(3) of the NLRA provides that an employer may not "encourage or discourage membership in any labor organization; Provided that nothing shall ... preclude an employer from making an agreement with a labor organization ... to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment...." 29 U.S.C. § 158(a)(3). The second proviso to § 8(a)(3) suggests that payment of "uniformly required" dues and fees will satisfy the membership requirement. *Id.* The Act further provides that no union may attempt to "cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3)...." 29 U.S.C. § 158(b)(2).

The Supreme Court has interpreted these provisions as an attempt by Congress to avoid the twin evils of compulsory unionism and employee free-riders, both of which are inherent risks of an exclusive bargaining arrangement. *See Beck,* 487 U.S. at 749, 108

S.Ct. at 2650. Section 8 strikes a balance with the following compromise: unions cannot force objectors to join as a condition of employment, but they can require that objectors pay for those core services which benefit all employees. *Id.*

> Taken as a whole, § 8(a)(3) permits an employer and a union to enter into an agreement requiring all employees to become union members as a condition of continued employment, but the 'membership' that may be so required has been 'whittled down to its financial core' ... [supporting] collective bargaining, contract administration, and grievance adjustment.

Id. at 745, 108 S.Ct. at 2648.

Marquez reasons that SAG breached the duty of fair representation by negotiating a CBA which continued to purport to require full union membership after *Beck.* She contends that the CBA's term is misleading to employees who do not know that federal law has limited their mandatory union obligation to the "financial core" outlined in *Beck.* Because SAG must have known that *Beck* does not permit mandatory union membership beyond the payment of "core" fees, its inclusion of the membership requirement in the CBA was an "arbitrary" or "bad faith" breach of the duty of fair representation according to Marquez.

Two of our sister Circuits have recently considered and rejected claims from plaintiffs who, like Marquez, wished to require unions to re-phrase their CBA's to reflect this "financial core" limitation on the concept of "membership." The courts held that terms requiring union "membership" continue to be permissible under federal law. *See International Union Electronic, Electrical, Salaried, Machine and Furniture Workers v. NLRB,* ("*IUE*") 41 F.3d 1532 (D.C.Cir. 1994); *Nielsen v. International Association of Machinists,* 94 F.3d 1107 (7th Cir.1996),

---

**2.** During the pendency of this suit, the parties amended the CBA to read as follows:
> As defined and applied in this section, the term 'member of the Union in good standing' means a person who offers to pay (and if the Union accepts the offer, pays) union initiation fees and dues as financial obligations in accordance with the requirements of the National Labor Relations Act.

As Marquez's alleged injury was caused by the enforcement of the agreement before its amendment, we will construe the CBA as it existed at the time giving rise to the cause of action. *See Teachers Local 1 v. Hudson,* 475 U.S. 292, 305 n. 14, 106 S.Ct. 1066, 1075 n. 14, 89 L.Ed.2d 232 (1986).

*cert. denied,* —— U.S. ——, 117 S.Ct. 1426, 137 L.Ed.2d 536 (1997); *but see Bloom v. NLRB,* 30 F.3d 1001, 1005 (8th Cir.1994) ("Because the overly broad union security clause was unlawfully interpreted and applied, an adequate remedy requires expunction of the offending clause.").

In *IUE,* the D.C. Circuit reversed a determination by the NLRB that a union acted in "bad faith" by negotiating a union security agreement requiring employees to "join the union" and "remain members of the Union in good standing as a term and condition of employment." *IUE,* 41 F.3d at 1535. The Board held that this language had become ambiguous because of legal glosses on the term, and could mislead employees about the extent of their obligations to the union. By maintaining this provision without explaining that the union could demand no more than the payment of "core" dues and fees, the Board held, the union breached its duty of fair representation. *Id.* at 1537.

The D.C. Circuit reversed, holding that there was no showing of a bad faith breach of the duty of fair representation under the *Vaca* standard because identical union security provisions had never previously been found to be "ambiguous" or misleading. A "bad faith" violation requires a showing of "fraud, deceitful or dishonest action." *IUE,* 41 F.3d at 1537. No such showing was possible in *IUE* because the NLRB had always permitted such membership terms in the past.

Marquez argues that *IUE* only ruled that there was no "bad faith" violation of the fair representation duty, while leaving open the question of whether such terms may constitute breach of the duty under the "arbitrary" prong of *Vaca.* However, the Seventh Circuit has rejected this claim in adopting the approach of *IUE:*

> We agree with the D.C. Circuit and the NLRB that *Beck* did not, either explicitly or implicitly, call into question the facial

validity of union security clauses.... In this case, as in *IUE* there is no evidence whatever that the union acted arbitrarily, discriminatorily, or in bad faith, within the meaning of *Vaca* and *O'Neill* when it negotiated the agency shop clause.... [3]

*Nielsen,* 94 F.3d at 1115.

We affirm the district court's conclusion that SAG did not breach its duty of fair representation by negotiating a CBA which requires covered actors to be members of the union in good standing.

### B

The CBA between Lakeside and SAG also includes the following provision:

> B. The foregoing subsection A., requiring as a condition of employment membership in the Union, shall not apply until on or after the thirtieth day following the beginning of such employment ...; the Union and the Producers interpret this sentence to mean that *membership in the Union cannot be required of any performer by a Producer as a condition of employment until thirty (30) days after his first employment as a performer in the motion picture industry.* (emphasis added)

Marquez argues that this term is a misapplication of the first proviso of NLRA § 8(a)(3). That section provides:

> [N]othing ... shall preclude an employer from making an agreement with a labor organization ... to require as a condition of employment *membership therein on or after the thirtieth day following the beginning of such employment ....*

29 U.S.C. § 158(a)(3) (emphasis added).

Marquez contends that the statute's term "such employment" is interpreted by the Board to mean each separate employment relationship, *see Theatrical Stage Employees Local 644,* 259 N.L.R.B. 1415, 1422, 1982 WL 24170 (1982), and that SAG therefore breached its duty of fair representation by negotiat-

---

3. The CBA clause at issue in *Nielsen* provided:
   As a condition of continued employment, all employees ... shall either become a member of the Union and pay dues thereto, or ... shall pay an amount equal to the Union's initiation fee and ... dues.

*Nielsen,* 94 F.3d at 1109–10. The union also had procedures to notify employees of their rights under *Beck* to pay only the core financial amounts. *Id.*

ing a term that required more than the statute permits. SAG counters that because of the unique circumstances of multiple short term jobs in the motion picture industry, "such employment" can legitimately be interpreted to mean "employment in the industry."

The district court held that this claim is preempted by the NLRA because it is nothing other than an unfair labor practices claim, depending entirely on the question of the proper interpretation of § 8(a)(3). It is therefore within the primary jurisdiction of the NLRB. *See San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 778, 3 L.Ed.2d 775 (1959). Marquez counters that she is not making a direct allegation that SAG engaged in an unfair labor practice within the meaning of the NLRA. Rather she argues that inclusion of the 30–day term in the CBA violates the union's judicially enforceable duty of fair representation because it requires more of employees than is permissible under authoritative interpretations of the statute. Under this approach the question would be within the jurisdiction of federal courts to enforce like any other fair representation claim.

Marquez is correct that federal courts will exercise jurisdiction over claims alleging breach of a union's duty of fair representation even if those claims also involve an arguable violation of § 8(a)(3). *See Breininger v. Sheet Metal Workers Local 6,* 493 U.S. 67, 75, 110 S.Ct. 424, 429, 107 L.Ed.2d 388 (1989) (that "a breach of duty of fair representation might also be an unfair practice is ... not enough to deprive a federal court of jurisdiction over the fair representation claim"). In *Beck,* for instance, the Supreme Court found that jurisdiction was proper over a claim alleging that the union breached its duty of fair representation by requiring non-members to contribute to services to which the employees objected. This fair representation claim was not preempted even though it involved an interpretation of the proper scope of § 8(a)(3). *See Beck,* 487 U.S. at 743, 108 S.Ct. at 2647.

However, the *Beck* court specifically warned federal courts not to be hoodwinked by a plaintiff's attempt to side-step the exclusive jurisdiction of the NLRB over unfair labor practices claims in this manner.

> Federal courts may resolve unfair labor practice questions that 'emerge as collateral issues in suits brought under independent federal remedies' ... [such as] the judicially implied duty of fair representation.... Employees, of course may not circumvent the primary jurisdiction of the NLRB simply by casting statutory claims as violations of the union's duty of fair representation.

*Id.* (internal citations omitted).

The court went on to explain that the employees' fair representation claim in *Beck* was not a disguised unfair practices claim, and that the "necessity of deciding the scope of § 8(a)(3) arises because [the union] seek[s] to defend themselves on the ground that the statute authorizes precisely this type of agreement." *Id.*

■ Discerning a principled distinction between a disguised unfair labor practices claim and a straightforward breach of duty claim is no simple matter, as any unfair labor practice can also be styled as a breach of the duty of fair representation. However, we agree with the district court that Marquez's challenge to the CBA's 30–day provision is preempted. Unlike the question presented in *Beck,* the challenge to SAG's interpretation of the 30–day grace period required by the NLRA does not raise the § 8(a)(3) claim as a collateral issue in an otherwise straightforward fair representation claim. Her claim rests squarely upon the proper interpretation of § 8(a)(3): if the CBA's 30–day term is proper under § 8(a)(3) then SAG wins; if not Marquez prevails.

We have previously explained our traditional deference to the NLRB in interpreting the requirements of the NLRA to unique fact situations:

> The desire to protect the primary jurisdiction of the NLRB flows from the need to maintain centralized administration of the NLRA by a specialized agency. Labor law involves many difficult questions of policy best left to the agency that has the expertise to solve them.... [T]he risk of interference with the NLRB's central ad-

ministration is great where the controversy presented to the court is one 'which could have been, but was not presented to the Labor Board.'

*Burke v. French Equipment Rental, Inc.,* 687 F.2d 307, 311 (9th Cir.1982) (internal citation omitted). The factually complex question of how properly to apply § 8(a)(3)'s requirements to hiring practices in the motion picture industry is precisely the kind of question that we think the NLRB was designed to address.

We affirm the district court's conclusion that Marquez's challenge to the CBA's 30 day term is preempted by the NLRB's exclusive jurisdiction.

### III

■ The district court also granted summary judgment to SAG on Marquez's claim alleging breach of the duty of fair representation in the enforcement of the union security term. Although there were some discrepancies in the record, the court held that no reasonable jury would conclude that SAG's actions amounted to a bad faith attempt to enforce the CBA beyond its legal limits.

■ In reviewing a summary judgment order we must "determine, viewing the facts in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir.1995).

### A

The record contains conflicting evidence with regard to whether SAG representatives impermissibly asserted that Marquez was required to "join" the union before she would be eligible to work or whether the term used was must "pay" the union. The contemporaneous typed notes by a Dixon/Walker casting assistant indicate that the Station 12 employee listed Marquez's status as "must join," and her talent agents who spoke with the casting agency said that this was the term used.

Later typed notes and a Station 12 written confirmation letter used the term "must pay," and SAG and Dixon/Walker casting employees testified that this was the term used. There was also evidence of some confusion over the term used because this was a period of transition between the "must join" and "must pay" terminology. SAG further argues that because Marquez's talent agents may have known that nothing more than payment of the fees was required, Marquez should have been on notice that she was not required to actually "join" the union. Even were this so, SAG's duty of fair representation runs directly to Marquez as an employee covered by an exclusive bargaining arrangement. If SAG asserted that Marquez was required to join the union as a condition of employment this would, of course, implicate its duty of fair representation owed to her.

The record is also unclear as to whether SAG policy required pre-payment of the dues before Marquez would be cleared to perform in the production. Station 12 employees repeatedly warned that Marquez was required to pay the dues and fees before she would be cleared. When Marquez's agent contacted SAG headquarters and outlined the impossibility of pre-payment, she was told that SAG would allow no more than 14 days for payment of the full amount. When challenged by a lawyer's letter threatening legal action, SAG faxed a letter to Lakeside on the day Marquez's replacement was filmed in her part, stating that SAG had no objection to Marquez performing in the production.

Obviously, each of these positions is mutually exclusive: either Marquez was required by SAG policy to pay before she was allowed to work as Station 12 suggested, or she was required to promise to pay within two weeks of working (though her request for 30 days to pay was specifically refused), or SAG had no objection to Marquez working in the production and would arrange for payment later. If the policy was actually to permit actors to work on SAG-covered jobs while working out a payment plan later, then SAG may have breached its duty by misinforming Marquez and the production staff that she would not be cleared to work on the project until she paid the union in full. If the policy was in

fact to require full payment before permitting an actor to work, this policy may also implicate the duty of fair representation under the arbitrariness prong of *Vaca*.

Finally, it is unclear from this record whether SAG gave Marquez notice that she would be obligated to pay some fees and dues when she had her first contact with the union. Marquez testified at a deposition that when she worked on a SAG-covered job in 1989 she had been required to fill in various union forms and was told that she was not obligated to pay any SAG fees as a condition of employment in that role. The record does not reflect whether she received notice at that time of SAG's interpretation of the 30-day rule, or that the next time she wished to work on a SAG-covered job she would be required to pay fees once she had worked "in the industry" more than thirty days.

As these genuine issues of material fact remain to be resolved with regard to SAG's enforcement of the CBA, we reverse the district court's summary judgment order over Marquez's claim that SAG breached its duty of fair representation in enforcing the CBA.

### B

The district court does not appear to have considered Marquez's allegations that SAG's failure to notify all employees of their right to pay the lesser "core" fees under *Beck* violates the duty of fair representation. Those Circuits which have upheld the facial validity of union security clauses have suggested that, because a CBA's membership requirement may be misleading, the unions have a duty to inform workers of the "core" payment option. *See, e.g., Abrams v. Communications Workers of America*, 59 F.3d 1373, 1379 (D.C.Cir.1995) (rejecting facial challenge to union security term, but requiring adequate notice of right to pay "core" fees and to challenge the "core" amount); *Nielsen* 94 F.3d at 1114 (problems might arise only if a union were to fail to provide appropriate notice to employees); *Id.* at 1115 (rejecting claim of unfair enforcement because notice of right to object was adequate and procedure for objecting was fair).

We have previously held that unions have a duty to inform workers of the steps they must take to retain their jobs before the union may request that an employer terminate their employment. *See, e.g., Sheet Metal Workers' Local 355 v. NLRB*, 716 F.2d 1249, 1254 (9th Cir.1983) (union has duty of to give employee clear notice of steps necessary to protect job tenure); *NLRB v. Teamsters Local 291;* 633 F.2d 1295, 1298–99 (9th Cir.1980) (union must give notice to employee before requesting discharge even if employee knew of his obligation to pay dues and the consequences of failing to pay). When an employee's job is at risk for failure to meet union dues obligations, the union "must deal fairly" with the employee. *Sheet Metal Workers'*, 716 F.2d at 1254 (quoting *Macaulay Foundry Co. v. NLRB*, 553 F.2d 1198, 1201 (9th Cir.1977)).

We think this duty may well include a requirement to inform workers of the minimal requirements with respect to the payment of only "core" dues and fees under *Beck.* The alternative position would mean that unions may demand more than federal law requires, while waiting for uninformed employees to request the "core" payment option. Surely the unspoken hope that employees will pay the full amount without question, which is the only plausible reason for failing to give such notice, does not constitute treating all employees fairly.

The only record facts relating to notice of employee's rights to pay less than 100% of the union's dues appear in an affidavit from Leonard Chassman, Hollywood Executive Director of SAG. He states that SAG "sends notices to all performers who notify SAG that they decline membership, either by resigning or refusing to join in the first instance, of their rights under federal labor law." Attached to the affidavit is a copy of the notice: it informs objectors that 1) they must pay dues if they intend to perform for employers who are signatories to their CBA; 2) they have the right to object to payment of dues for non-representational ("non-core") activities; 3) the representational ("core") activities dues are 97.2% of Guild dues.

SAG claims that it has an adequate system for "notifying all nonmember employees who

make payments pursuant to its union security clause of their right to object and pay only the collective bargaining portion of the agency fee." The union explains that Marquez never received this notice because SAG was never told that Marquez did not wish to join the union.[4]

We remand this question to the district court to consider whether SAG's apparent lack of notice to all employees of the "core" payment option, in conjunction with the Marquez's other allegations, constituted an arbitrary breach of the duty of fair representation "in light of the factual and legal landscape at the time of the union's actions," *O'Neill,* 499 U.S. at 67, 111 S.Ct. at 1129.

### C

Finally, Marquez argues that the district court erred in failing to consider her claim that SAG breached its duty under the arbitrary prong of *Vaca* in its enforcement of the CBA. The district court's order does not address the arbitrariness analysis, although Marquez did include this argument in her opposition to summary judgment.

In explaining *Vaca's* arbitrariness standard we have held that even unintentional acts and omissions may constitute a breach of the duty of fair representation. "[U]nintentional acts or omissions by union officials may be arbitrary if [1] they reflect reckless disregard for the rights of an individual employee, ... [2] they severely prejudice the injured employee, ... and [3] the policies underlying the duty of fair representation would not be served by shielding the union from liability in the circumstances of the particular case." *Robesky v. Qantas Empire Airways Ltd.* 573 F.2d 1082, 1090 (9th Cir. 1978) (internal citations omitted).

There are several related factual allegations involved in Marquez's claim that SAG acted arbitrarily in enforcing the union security term. These allegations should be considered together to determine whether there was a breach under the totality of circumstances. *See Castaneda v. Dura–Vent,* 648 F.2d 612, 618 (9th Cir.1981) (instructing district court on remand to consider the totality of union's acts in determining whether it breached duty of fair representation).

While SAG argues that Marquez will not be able to satisfy *Robesky's* three-part test, we nevertheless remand this question to the district court to consider it in conjunction with the other factual allegations in this claim. *See Robesky,* 573 F.2d at 1091 (remanding for district court to consider claim that union acts satisfied test for arbitrary breach of duty of fair representation).

### D

To summarize, we reverse the district court's summary judgment order as to Marquez's claim that SAG's enforcement of the CBA breached the duty of fair representation because disputes over genuine issues of material fact preclude summary judgment, and because the court failed both to address a portion of Marquez's allegations in considering the enforcement claim, and to conduct an analysis of Marquez's breach claim under the arbitrariness standard of *Vaca.* We remand for resolution of these matters.

### IV

Marquez's second claim for relief against Lakeside and SAG is brought under § 301 and alleges that the defendants together breached implied federal law terms of the CBA when Lakeside replaced Marquez because SAG had not cleared her to work on the production. This claim alleges: (1) that the NLRA does not permit CBAs to require membership obligations, payment of dues for the first 30 days of employment, or payments in excess of core amounts; and (2) SAG and Lakeside violated these implied-in-law rights of employees because they "maintain and enforce their [CBA's] against employees ... which on their face and as applied violate" the NLRA's limitations.

We have already concluded that the union security term does not violate federal law and that the CBA's interpretation of the

---

4. We find no merit in SAG's alternative claim that Marquez had not accepted Lakeside's offer of employment. The record is clear that all understood that she had accepted the role and that only SAG's refusal to clear her for work stood in the way of her performance.

**1044**

NLRA's 30–day grace period is within the exclusive jurisdiction of the NLRB. This reasoning applies with equal force to Marquez's contention that Lakeside and SAG breached implied terms of the CBA by maintaining a CBA with these provisions.

The only remaining claim against SAG is the alleged breach of the duty of fair representation in its enforcement of the CBA. Marquez argues that because Lakeside is "implicated" in SAG's allegedly wrongful conduct, Lakeside should also be held liable for SAG's breach of the duty of fair representation. We disagree.

Marquez argues that Lakeside is implicated in SAG's alleged failures in fairly representing her because it "aided and abetted" SAG by hiring a casting director who cleared employees through Station 12, and by replacing her in the role when SAG did not clear her for work. She does not claim, however, that Lakeside had any affirmative duties to inform Marquez of her rights with regard to paying union dues or that Lakeside impermissibly sought to force her to join the union. *See Nielsen,* 94 F.3d at 1117 (dismissing employer from § 301 suit claiming breach of union's duty of fair representation in negotiation and enforcement of union security term). Nor is Lakeside a necessary party to obtain full relief through contract reformation, as the facial challenge to the CBA does not survive.

We therefore affirm the district court's dismissal of the breach of contract claim.[5]

### V

We affirm the district court's order of summary judgment as to Marquez's claim that SAG breached its duty of fair representation by negotiating the CBA's union security term. We also affirm the court's dismissal of Marquez's second claim alleging that SAG and Lakeside breached implied terms of the CBA. However, we reverse summary judgment on Marquez's claim that SAG arbitrarily or in bad faith breached its duty of fair representation in the enforcement of the

CBA, and remand for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings. **Each party to pay its own cost.**

---

5. Because we affirm summary judgment on Marquez's second claim, we do not reach the question of whether Marquez was required to exhaust contractual remedies before bringing this claim.