**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHERYL ANN BECK,
    *Plaintiff-Appellee,*

   v.

UNITED FOOD AND COMMERCIAL
WORKERS UNION, Local 99,
    *Defendant-Appellant.*

No. 05-16414

D.C. No.
CV-02-00495-EHC

OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued and Submitted
May 14, 2007—San Francisco, California

Filed November 1, 2007

Before: Cynthia Holcomb Hall, Diarmuid F. O'Scannlain,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

14417

## COUNSEL

Michael T. Anderson, Davis, Cowell & Bowe, LLP, San Francisco, California, for the defendant-appellant.

Helen Perry Grimwood, The Grimwood Law Firm plc, Phoenix, Arizona, for the plaintiff-appellee.

## OPINION

IKUTA, Circuit Judge:

Local 99 of the United Food and Commercial Workers Union appeals from the district court's determination that Local 99 violated Title VII and breached its duty of fair representation in connection with the termination of one of its members, Cheryl Beck. Local 99's appeal requires us to consider the proper role of comparative evidence in a Title VII case against a union and the framework that must be applied to a member's claim that the union breached its duty of fair representation. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm the district court's decision.

## FACTUAL AND PROCEDURAL BACKGROUND

Before she was terminated for two alleged incidents of profanity, Cheryl Beck was employed as a scanning coordinator by Fry's Food Stores. At all relevant times, Beck's employment was governed by the collective bargaining agreement between Local 99 and Fry's which prohibited the use of "profane, abusive or threatening language toward fellow employees." The collective bargaining agreement also provided that an employee could not be disciplined without "just cause."

On April 13, 2001, Beck had a conversation with Bob Evans in the parking lot of Fry's Prescott store before report-

ing to work. Evans, an employee with whom Beck previously had a romantic relationship, had recently been promoted. The conversation became heated when Beck implied that Evans' recent promotion was due to favoritism, not merit. Evans subsequently submitted a statement to Fry's management accusing Beck of using profanity in the course of this conversation. No one else witnessed the incident.

Acting upon Evans' statement, Fry's suspended Beck. Beck reported this suspension to Barbara Cleckner, Local 99's field representative. A meeting was scheduled on April 20, 2001, among Beck, Cleckner, and Fry's, for the administration of any discipline. Prior to the meeting, Fry's management informed Cleckner that it intended to terminate Beck on the ground that Beck had a "history of a foul mouth." In eight and a half years of working for Fry's and its predecessor Smith's, Beck had not previously been disciplined for using profanity.

In her meeting with Cleckner prior to the scheduled meeting with Fry's management, Beck denied using profanity in her April 13, 2001 conversation with Evans. She also maintained that any statements made in the course of her conversation with Evans were not actionable because the conversation occurred while Beck was off duty.

At the April 20, 2001 meeting, Fry's issued Beck a "Final Written Warning," which provided, in relevant part, that "any further conduct [involving] the use of profanity, inappropriate comments or malicious gossip will result in termination." At trial, Beck testified she asked Cleckner to file a grievance contesting the warning. Knowing of both Fry's intent to terminate Beck, and of Beck's health problems, Cleckner promised to file Beck's requested grievance but she never did so.

On July 5, 2001, Beck had an argument with Cecil Carr, the store secretary, over a pay error. Carr asserted that Beck used profanity in the course of the argument, an accusation Beck

denied. Fry's credited Carr's version of the incident and terminated Beck on July 9, 2001.

At Beck's request, Local 99 filed a grievance contesting Beck's termination. Beck provided Local 99 with a six-page statement setting forth the basis for her grievance. A representative from Fry's Human Resources Department conducted an investigation of the events leading up to Beck's termination and provided Local 99 with copies of relevant notes, records, and employee statements gathered in the course of that investigation. In September, Local 99 contacted its attorney to determine whether it was legally required to demand arbitration of Beck's grievance. The attorney provided an opinion letter stating that, in his view, a single incident of alleged profanity would not constitute just cause for discharge. However, the attorney opined that an arbitrator would "almost certainly" conclude that termination for a second incident of profanity constituted just cause when the first incident resulted in an unchallenged written warning less than three months earlier. Local 99 subsequently informed Beck that it would not arbitrate her grievance.

After obtaining a right-to-sue letter from the Equal Employment Opportunity Commission, Beck filed the present action in United States District Court for the District of Arizona, alleging that Local 99 discriminated against her on the basis of her sex in violation of § 703(c)(1) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(c)(1),[1] and that Local 99 breached its duty to represent her fairly.[2] The case proceeded to a bench trial.

As the plaintiff in a Title VII disparate treatment case, Beck

---

[1] "It shall be an unlawful employment practice for a labor organization . . . to discriminate against, any individual because of his race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(c)(1).

[2] Fry's was originally named as a co-defendant, but later settled with Beck.

bore the burden of proving that Local 99's actions were motivated by intentional sex discrimination. Beck sought to carry this burden by demonstrating that the grievances of two similarly situated men were handled by the same Local 99 representatives with greater zeal than her grievances and the grievance of another similarly situated female. Specifically, Beck introduced evidence that Cleckner and other Local 99 representatives aggressively represented Larry Molitor, a male employee who had been the subject of multiple disciplinary actions, including discipline for using "profane language, racially discriminatory remarks, and threatening comments," for threatening a co-worker with a twelve-inch knife, and for "unprofessional conduct, threatening of employees, [and] throwing product and equipment." Second, Beck introduced evidence that Local 99 aggressively represented Don Pulaski, a male employee who had been suspended after he had a tussle with another employee. The union successfully represented Pulaski, who was reinstated by Fry's. Finally, Beck introduced evidence that Local 99 did not aggressively represent Lois Reinhold, a female employee, who was terminated for allegedly extending the expiration date on some meat. Although there was evidence that the male employee who replaced Reinhold, and the male employee who had worked with Reinhold, engaged in the same conduct and were not terminated, the union did not use this comparison to help Reinhold win her job back.

The district court inferred from Beck's evidence regarding the three employees that Local 99's decisions not to pursue Beck's grievances were fueled by discriminatory animus. Having found that the union's actions were motivated by sex discrimination, the district court entered judgment in favor of Beck on her Title VII claim.

With respect to Beck's duty of fair representation claim, the district court ruled that the union breached its duty in handling both Beck's April warning and her subsequent July termination. The district court determined that Local 99's failure to

file a grievance contesting the April warning constituted an arbitrary, discriminatory, and bad faith failure to perform a ministerial action. The district court also concluded that Local 99's decision not to arbitrate Beck's July termination was the result of discrimination and bad faith.

As to both these claims, the district court awarded Beck $16,304 in lost wages, $125,000 in compensatory damages for emotional distress, $50,000 in punitive damages, and attorney's fees and costs, not yet fixed. Local 99 timely appealed.

## DISCUSSION

### I

We first turn to the district court's holding that Local 99 breached its duty of fair representation in handling Beck's grievances. "The duty of fair representation is a judicially established rule imposed on labor organizations because of their status as the exclusive bargaining representative for all of the employees in a given bargaining unit." *Peterson v. Kennedy*, 771 F.2d 1244, 1253 (9th Cir. 1985). The duty of fair representation exists because a single labor organization represents the interests of all employees within a unit, and "if individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the representative organization to 'serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.' " *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 n.14 (1983) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). The burden of proving a breach of the duty of fair representation is on the plaintiff. *Vaca,* 386 U.S. at 193; *Slevira v. W. Sugar Co.*, 200 F.3d 1218, 1221 (9th Cir. 2000) (citing *Vaca*).

A union breaches its duty of fair representation when its "conduct toward a member of the collective bargaining unit

is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190; *see also Air Line Pilots Ass'n. Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). Conduct can be classified as arbitrary "only when it is irrational, when it is without a rational basis or explanation." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998). This deferential standard for arbitrary conduct "gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez*, 525 U.S. at 45-46.

In light of this standard, we have analyzed the breach of the duty of fair representation on a continuum. *See Peters v. Burlington N.R.R. Co.*, 931 F.2d 534, 539-40 (9th Cir. 1991) (" '[M]inisterial act' and 'act of judgment' represent . . . opposing points on a continuum that broadly attempts to separate discretionary decision making from inexplicable conduct."); *see also Marino v. Writers Guild of Am., E., Inc.*, 992 F.2d 1480, 1486 (9th Cir. 1993).

On one end of the continuum is intentional conduct by a union exercising its judgment. *Peters*, 931 F.3d at 539-40. As noted above, a union's conduct constitutes an exercise of judgment entitled to deference even when the union's "judgments are ultimately wrong." *Marquez*, 525 U.S. at 45-46. Under Supreme Court precedents, so long as a union exercises its judgment, no matter how mistakenly, it will not be deemed to be wholly irrational. *Id.* at 46; *O'Neill*, 499 U.S. at 78. We may decline to give a union the deference owed to an exercise of judgment only where union actions or inactions are "so far outside a wide range of reasonableness that [they are] wholly irrational or arbitrary." *O'Neill*, 499 U.S. at 78 (internal quotations and citations omitted); *see also Peters*, 931 F.2d at 540 ("[I]t makes little sense to allow a union to hide behind the mantle of 'judgment' and 'discretion' when the evidence suggests that it actually exercised neither."); *Peterson v. Kennedy*, 771 F.2d 1244, 1254 (1985) ("In *all* cases in which we found a breach of the duty of fair representation based on a union's arbitrary conduct, it is clear that the union failed to

perform a procedural or ministerial act, that the act in question did not require the exercise of judgment and that there was no rational and proper basis for the union's conduct." (emphasis added)).

Although we cannot deem a union's exercises of judgment to be wholly irrational and thus arbitrary, a union can still breach the duty of fair representation if it exercised its judgment in bad faith or in a discriminatory manner. *Moore v. Bechtel Power Corp.*, 840 F.2d 634, 636 (9th Cir. 1988). To establish that the union's exercise of judgment was discriminatory, a plaintiff must adduce "substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301 (1971) (internal quotations omitted); *see also Vaca*, 386 U.S. at 177. To establish that the union's exercise of judgment was in bad faith, the plaintiff must show "substantial evidence of fraud, deceitful action or dishonest conduct." *Lockridge*, 403 U.S. at 299.

On the other end of the continuum are actions or omissions that are unintentional, irrational or wholly inexplicable, such as an irrational failure to perform a ministerial or procedural act, *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1273 (9th Cir. 1983); *see also Marquez v. Screen Actors Guild, Inc.*, 124 F.3d 1034, 1043 (9th Cir. 1997), *aff'd*, 525 U.S. 33 (1998). We have referred to such actions or omissions as "arbitrary" action. For example, courts have consistently refused to accept unions' claims that their actions involved any judgment or strategy where the union simply failed to perform some procedural act. *See, e.g.*, *Peters*, 931 F.2d at 541 ("[plaintiff] had presented a triable question as to whether the union acted in a completely arbitrary, indifferent manner by failing to research the [collective bargaining agreement]"); *Moore*, 840 F.2d at 637 (failure to provide notice of meetings and tardy notification of a grievance decision might be arbitrary); *Galindo v. Stoody Co.*, 793 F.2d 1502, 1514 (9th Cir.

1986) (union representative's failure to notify employer that employee was a steward was arbitrary where the representative knew of impending layoffs); *Dutrisac*, 749 F.2d at 1274 (union's failure to file a grievance on time was arbitrary); *Robesky v. Qantas Empire Airways, Ltd.*, 573 F.2d 1082, 1091 (9th Cir. 1978) ("trier of fact could reasonably find that the Union's failure to disclose to appellant that her grievance would not be submitted to arbitration" was arbitrary).

These arbitrary actions can breach the duty of fair representation only where the act substantially injures the union member. Such an injury may arise in situations where "the individual interest at stake is strong" and the union's arbitrary action or omission "completely extinguishes the employee's [grievance] right[s]," *Dutrisac*, 749 F.2d at 1274, or where the union's arbitrary actions " 'reflect reckless disregard for the rights of an individual employee,' " or " 'severely prejudice the injured employee' " under circumstances that do not further the policies underlying the duty of fair representation. *Marquez*, 124 F.3d at 1043 (quoting *Robesky*, 573 F.2d at 1090).

**[1]** In sum, in order to hold that union conduct breached the duty of fair representation, we must determine either that the union conduct at issue is a discriminatory or bad faith exercise of judgment, or is an arbitrary (meaning wholly irrational, inexplicable, or unintentional) action that substantially injured an employee. *See, e.g.*, *Marino v. Writers Guild of Am., E., Inc.*, 992 F.2d 1480, 1486 (9th Cir. 1993).

We review de novo the question whether the union engaged in arbitrary conduct that substantially injured a member, and thus amounted to a breach of its duty of fair representation. *Galindo*, 793 F.2d at 1513 (citing *United States v. McConney*, 728 F.2d 1195, 1204 (9th Cir. 1984) (en banc)).

A

The district court determined that Local 99's failure to file a grievance with respect to Beck's April warning did not stem

from Local 99's exercise of judgment, but was instead a ministerial act. Local 99 contests the district court's ruling, contending that its decision not to challenge Beck's April warning was a rational exercise of judgment to which the district court should have deferred.

**[2]** We must reject Local 99's argument on this point. The record in this case supports the district court's conclusion that Local 99's decision not to pursue Beck's grievance stemmed not from its evaluation of the merits of Beck's complaint, but rather from a failure to perform the ministerial action of filing a timely grievance. Cleckner testified at trial that she informed Beck that Local 99 would file a grievance challenging the April warning if Beck so desired. There is no dispute that Cleckner had the authority to make this representation on the union's behalf. The district court credited Beck's testimony that she had requested Cleckner to file the grievance. Where a union has agreed to file a grievance but fails to file the grievance in a timely fashion, the union's error is properly characterized as a "failure to perform a ministerial act required to carry out [its] decision." *Dutrisac*, 749 F.2d at 1273.

**[3]** The district court further determined that the union's failure to file the grievance was an arbitrary action that substantially injured Beck, and thus a breach of its duty of fair representation. We agree. The district court found that Beck "would not have been terminated for the July 2001 incident but for the Union's failure to file a grievance with respect to the April 2001 incident." This finding is consistent with the opinion letter of Local 99's attorney, which concluded that arbitration of Beck's termination would be futile given Beck's failure to timely challenge the April warning. As a result of this advice from its attorney, Local 99 subsequently declined to arbitrate Beck's grievance. Therefore, Local 99's failure to challenge Beck's April warning effectively extinguished her right to challenge her ultimate termination.

**[4]** Because "the individual interest at stake is strong and the union's failure to perform a ministerial act completely extinguishes the employee's right to pursue [her] claim," *Dutrisac*, 749 F.2d at 1274, the union's failure to file the original grievance was not mere negligence. Rather, the union here treated Beck's claim "so lightly as to suggest an egregious disregard of her rights." *Wellman v. Writers Guild of Am., W., Inc.*, 146 F.3d 666, 671 (9th Cir. 1998) (internal quotations omitted). We have emphasized that "[t]he union should be held to a higher standard of care in discharge cases involving off-duty conduct because the sanction is severe and the nexus between job performance and the alleged misconduct is more attenuated." *Johnson v. USPS*, 756 F.2d 1461, 1465-66 (9th Cir. 1985). The policies underlying the duty of fair representation would not be served by shielding Local 99 from liability for this unexplained failure. *See Marquez*, 124 F.3d at 1043. Under these circumstances, the district court was correct in determining that Local 99's failure to perform a ministerial function of filing a timely grievance concerning Beck's April discipline is arbitrary conduct establishing a breach of Local 99's duty of fair representation. *See Vaca*, 386 U.S. at 191 (union acts "arbitrarily" when it simply ignores a meritorious grievance or handles it in a perfunctory manner).

B

**[5]** Local 99 also challenges the district court's determination that it breached its duty of fair representation in handling Beck's July termination. The district court concluded that Local 99's decision not to arbitrate Beck's termination was not entitled to deference because it was tainted by the Union's intentional gender discrimination and bad faith conduct. Because we conclude that the Union breached the duty of fair representation with respect to its handling of Beck's April warning, and that Beck's ultimate termination was a direct consequence of that breach, we need not decide whether

Local 99 also breached the duty of fair representation in declining to subsequently arbitrate Beck's July termination.

## II

We must also address the district court's finding that Local 99 discriminated against Beck on the basis of her sex in violation of Title VII by failing to provide her with the same quality of representation as it provided to similarly situated males.

## A

We review legal questions relating to a Title VII or similar sex discrimination claim de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir. 1984) (en banc). A finding of discriminatory intent is a finding of fact reviewed for clear error. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993); *USPS Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). So long as the district court's findings are "plausible," we must not set them aside even if "sitting as the trier of fact, [we] would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

**[6]** Section 703(c)(1) of Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for a labor organization . . . to discriminate against[ ] any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(c)(1). A union violates Title VII if it deliberately declines to pursue a member's claim because of the member's gender. *See Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 671-74 (9th Cir. 1988).

**[7]** The standard burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), applies to a Title VII action against a union. *See Pejic*, 840 F.2d at 674. Adapting the *McDonnell Douglas* criteria[3] to a § 703(c)(1) action, a union member can

---

[3]*McDonnell-Douglas* set forth the elements of a prima facie case as follows:

make a prima facie claim of discrimination by introducing evidence that the member "was singled out and treated less favorably than others similarly situated on account of race or any other criterion impermissible under the statute." *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 537 (9th Cir. 1982); *see also Pejic*, 840 F.2d at 674. As in *McDonnell Douglas*, such a showing of disparate treatment raises an inference of discrimination "because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978).

If the plaintiff succeeds in establishing a prima facie case of discrimination against the union, the burden of production shifts to the union to articulate a legitimate, non-discriminatory reason for the less favorable treatment. *Pejic*, 840 F.2d at 674. The union must provide "reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the . . . action." *Hicks*, 509 U.S. at 507. Once the defendant produces sufficient evidence to satisfy this burden, " 'the *McDonnell Douglas* framework — with its presumptions and burdens' — disappear[s]," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (quoting *Hicks*, 509 U.S. at 510), and the plaintiff "retains that ultimate burden of persuading the [trier of fact] that [he] has been the victim of

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802 (footnote omitted).

intentional discrimination." *Hicks*, 509 U.S. at 508 (internal quotations omitted).

The trier of fact may infer the ultimate fact of intentional discrimination from the plaintiff's prima facie case and disbelief of the defendant's explanation for the action. *See Reeves*, 530 U.S. at 147 ("Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."); *Hicks*, 509 U.S. at 511. However, a trier of fact is not required to infer discrimination even if the employer's proffered explanation is unpersuasive. *Reeves*, 530 U.S. at 148; *see also Hicks*, 509 U.S. at 524.

**[8]** It is well established that a Title VII plaintiff may prove a defendant's discriminatory motive through circumstantial evidence alone. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *Aikens*, 460 U.S. at 714 n.3; *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1030 (9th Cir. 2006). Evidence that one or more similarly situated individuals outside of the protected class received more favorable treatment can constitute sufficient evidence of discrimination for a Title VII plaintiff to prevail. *See, e.g.*, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 (1976) (holding that a plaintiff can establish a Title VII violation based on evidence that two white employees "were discharged for their alleged participation in a misappropriation of cargo . . . but that a fellow [non-white] employee . . . was not"); *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1172 (9th Cir. 2007) (evidence that an employer favored a "more junior, less qualified" religious employee over a non-religious employee supported an inference of discrimination); *Josephs v. Pac. Bell*, 443 F.3d 1050, 1065 (9th Cir. 2006) (holding that the district court did not err in admitting comparative evidence regarding three similarly situated employees); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (evaluating comparative evidence regarding two other employees); *Raad v. Fairbanks N. Star Bor-*

*ough*, 323 F.3d 1185, 1194 (9th Cir. 2003) (holding that plaintiff "demonstrated a genuine factual dispute as to whether . . . proffered reasons were pretextual," where defendant hired a less-qualified applicant); *cf. Snead v. Metropolitan Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001) (evidence that one other similarly situated employee was treated in a similar manner negated plaintiff's showing of pretext).

## B

In this case, the district court held that Beck proved the ultimate fact of intentional discrimination based on her prima facie case. Relying on *EEOC v. Reynolds Metals Co.*, 212 F. Supp. 2d 530, 539-40 (E.D. Va. 2002), the district court stated, "To establish a Title VII sex discrimination claim against a union, an employee must show that: (1) the employer violated the collective bargaining agreement with respect to the employee; (2) the union breached its duty of fair representation by allowing the breach to go unrepaired; and (3) there is some evidence of gender animus among the union." This test, derived from a Seventh Circuit test for establishing a prima facie case of discrimination, *see Bugg v. Int'l Union of Allied Indus. Workers of Am.*, 674 F.2d 595 (7th Cir. 1982), is generally consistent with the *McDonnell Douglas* framework.[4]

Addressing these prongs, the district court first concluded that Fry's had violated the collective bargaining agreement in

---

[4]We note that the third prong of the district court's test has been superseded by *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), which held that a Title VII plaintiff need not show that the union had a negative animus toward the protected class. *Id.* at 669. Of course, while evidence of the union's animus is not required, a union member must still introduce evidence that the member "was singled out and treated less favorably than others similarly situated on account of race or any other criterion impermissible under the statute." *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 537 (9th Cir. 1982); *see also* 42 U.S.C. § 2000e-2(c)(1).

terminating Beck without just cause. The district court then determined that Local 99 failed to repair the breach of the agreement, by not filing a grievance despite Beck's request and Cleckner's knowledge that Fry's intended to terminate Beck. Finally, the court held that the union's "failure to repair the breach was due to a discriminatory motivation based on plaintiff's sex."

The district court's ruling was based on a number of findings. First, the court found that "[f]or men, the Union was an aggressive advocate," but "[f]or women like Reinhold and [Beck], the Union effectively accepted Fry's decisions instead of taking their claims to arbitration." The court concluded that the same union representatives "fail[ed] to provide the same quality of representation" for Beck as for "similarly situated males." The court also found that at least one male employee (Molitor) who received more favorable treatment than Beck was "similarly situated in all material respects" to Beck. Finally, the court found that Local 99's "handling of Reinhold's grievance strengthens the inference that it intentionally discriminated on the basis of sex in handling the grievances of female members."

Evaluating this evidence, the district court made a factual determination that only a discriminatory motive could explain why Local 99 failed to represent Cheryl Beck aggressively. The district court concluded that Local 99 discriminated against Beck on the basis of her sex and ruled that Beck had succeeded in proving her Title VII case.

On appeal, Local 99 asserts that the evidence offered by Beck to establish Local 99's discriminatory intent was insufficient as a matter of law to support the district court's inference of discriminatory motive. Local 99 argues that Beck could not raise an inference of discrimination based on two similarly situated males and one similarly situated female, because an inference of discriminatory intent does not arise as a matter of law where the statistical evidence is based on too

small a sample size, does not presents a "stark pattern" of discrimination, and does not "account for possible nondiscriminatory variables." *Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 663 (9th Cir. 2002); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000); *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1076 (9th Cir. 1986).

**[9]** Our cases do not always clearly distinguish between statistical evidence that is non-probative because it is based on too small a sample size, and permissible comparative evidence of one or more similarly situated individuals. However, in general, we have upheld inferences of discriminatory motive based on comparative data involving a small number of employees when the plaintiff establishes that he or she is "similarly situated to those employees in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006); *see, e.g.*, *Vasquez*, 349 F.3d at 641 (employee not similarly situated where he "did not engage in problematic conduct of comparable seriousness to that of [plaintiff]"); *Aragon*, 292 F.3d at 663 (evidence that three of four employees laid off were white did not "account for possible nondiscriminatory variables, such as job performance"); *Coleman*, 232 F.3d at 1283 (finding no evidence of age discrimination where "statistics failed to account for obvious variables — including education, previous position at the company, and distribution of age groups by position — that would have affected the results of the analysis"); *Wall v. Nat'l R.R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir. 1983) (affirming district court's holding for defendant where, among other facts, "[t]he three white employees who were not discharged for conduct similar to that for which Wall was discharged had no prior disciplinary records").

**[10]** Here, Beck's evidence was comparative in nature, rather than statistical. The district court found that Local 99 provided more aggressive representation of two men than it did of Beck and Reinhold. It also found that Beck and Molitor

were similarly situated "in all material respects," and that Beck was similarly situated to other male employees who received more favorable treatment from the same union representatives.[5] We cannot say that, as a matter of law, such evidence was an insufficient basis for the district court's conclusion that the union had intentionally discriminated against Beck, even though the comparative evidence was based on only three individuals in addition to Beck. *See, e.g.*, *McDonald*, 427 U.S. at 282. Based on our review of the record, the district court's findings are not clearly erroneous. Therefore, we affirm the district court's ruling on Beck's Title VII claim.

## III

In sum, we hold that the district court's inference of discriminatory intent was not clearly erroneous, and accordingly we affirm the district court's judgment on Beck's Title VII claim. We affirm the judgment of the district court with respect to its determination that Local 99 breached its duty of fair representation in handling Beck's April discipline.

**AFFIRMED**.

---

[5]Local 99 also challenges the district court's finding that Beck and Molitor were "similarly situated in all material respects." We agree with our sister circuits that whether two employees are similarly situated is ordinarily a question of fact. *George v. Leavitt*, 407 F.3d 405, 414-15 (D.C. Cir. 2005); *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *Riggs v. AirTran Airways, Inc.*, 2007 U.S. App. LEXIS 18769, at *16 (10th Cir. Aug. 8, 2007). While Local 99 is correct that we may review the district court's interpretation of a collective bargaining agreement de novo, *Rathgeb v. Air Cal, Inc.*, 812 F.2d 567, 570 (9th Cir. 1987), the district court's finding that Molitor and Beck were similarly situated in all material respects was not dependent on any interpretation of Local 99's CBA with Fry's, and was not clearly erroneous.