MARQUEZ *v.* SCREEN ACTORS GUILD, INC., ET AL.

No. 97–1056.   Argued October 5, 1998—Decided November 3, 1998

34

*Raymond J. LaJeunesse, Jr.,* argued the cause and filed briefs for petitioner.

*Leo Geffner* argued the cause for respondents. With him on the briefs were *Ira L. Gottlieb, Jonathan P. Hiatt, James B. Coppess,* and *Laurence Gold.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Section 8(a)(3) of the National Labor Relations Act (NLRA), 49 Stat. 452, as added, 61 Stat. 140, 29 U. S. C. § 158(a)(3), permits unions and employers to negotiate an agreement that requires union "membership" as a condition of employment for all employees. We have interpreted a proviso to this language to mean that the only "membership" that a union can require is the payment of fees and dues, *NLRB* v. *General Motors Corp.*, 373 U. S. 734, 742 (1963), and we have held that § 8(a)(3) allows unions to collect and expend funds over the objection of nonmembers only to the extent they are used for collective bargaining, contract administration, and grievance adjustment activities, *Communications Workers* v. *Beck*, 487 U. S. 735, 745, 762–763 (1988). In this case, we must determine whether a union breaches its duty of fair representation when it negotiates a union security clause that tracks the language of § 8(a)(3) without explaining, in the agreement, this Court's interpretation of that language. We conclude that it does not.

We are also asked to review the Court of Appeals' decision that the District Court did not have jurisdiction to decide a claim that a union breached the duty of fair representation by negotiating a clause that was inconsistent with the statute. We conclude that because this challenge to the union security clause was based purely on an alleged inconsistency with the statute, the Court of Appeals correctly held that this claim was within the primary jurisdiction of the National Labor Relations Board (NLRB or Board).

I

A

The language of § 8(a)(3) is at the heart of this case. In pertinent part, it provides as follows:

"It shall be an unfair labor practice for an employer—
"(3) by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership

in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . . . *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization . . . if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." 29 U. S. C. § 158(a)(3).

This section is the statutory authorization for "union security clauses," clauses that require employees to become "member[s]" of a union as a condition of employment. See *Communications Workers* v. *Beck, supra,* at 744–745.

The conclusion that § 8(a)(3) permits union security clauses is not the end of the story. This Court has had several occasions to interpret § 8(a)(3), and two of our conclusions about the language of that subsection bear directly on this case. First, in *NLRB* v. *General Motors Corp., supra,* at 742–743 (citing *Radio Officers* v. *NLRB,* 347 U. S. 17, 41 (1954)), we held that although § 8(a)(3) states that unions may negotiate a clause requiring "membership" in the union, an employee can satisfy the membership condition merely by paying to the union an amount equal to the union's initiation fees and dues. See also *Pattern Makers* v. *NLRB,* 473 U. S. 95, 106, n. 16, 108 (1985). In other words, the membership that may be required "as a condition of employment is whittled down to its financial core." *NLRB* v. *General Motors Corp., supra,* at 742. Second, in *Communications Workers* v. *Beck, supra,* we considered whether the employee's "financial core" obligation included a duty to pay for support of

union activities beyond those activities undertaken by the union as the exclusive bargaining representative. We held that the language of § 8(a)(3) does not permit unions to exact dues or fees from employees for activities that are not germane to collective bargaining, grievance adjustment, or contract administration. *Id.*, at 745, 762–763. As a result of these two conclusions, § 8(a)(3) permits unions and employers to require only that employees pay the fees and dues necessary to support the union's activities as the employees' exclusive bargaining representative.

## B

Respondent Screen Actors Guild (SAG or union) is a labor organization that represents performers in the entertainment industry. In 1994, respondent Lakeside Productions (Lakeside) signed a collective bargaining agreement with SAG, making SAG the exclusive bargaining agent for the performers that Lakeside hired for its productions. This agreement contained a standard union security clause, providing that any performer who worked under the agreement must be "a member of the Union in good standing." App. 28. Tracking the language of § 8(a)(3), the clause also provided:

> "The foregoing [section], requiring as a condition of employment membership in the Union, shall not apply until on or after the thirtieth day following the beginning of such employment or the effective date of this Agreement, whichever is the later; the Union and the Producers interpret this sentence to mean that membership in the Union cannot be required of any performer by a Producer as a condition of employment until thirty (30) days after his first employment as a performer in the motion picture industry . . . . The Producer shall not be held to have violated this paragraph if it employs a performer who is not a member of the Union in good standing . . . if the Producer has reasonable grounds for

believing that membership in the Union was denied to such performer or such performer's membership in the Union was terminated for reasons other than the failure of the performer to tender the periodic dues and the initiation fee uniformly required as a condition of acquiring or retaining membership in the Union . . . ." *Id.*, at 28–29.

The present dispute arose when petitioner, a part-time actress, successfully auditioned for a one-line role in an episode of the television series, Medicine Ball, which was produced by Lakeside. Petitioner accepted the part, and pursuant to the collective bargaining agreement, Lakeside's casting director called SAG to verify that petitioner met the requirements of the union security clause. Because petitioner had previously worked in the motion picture industry for more than 30 days, the union security clause was triggered and petitioner was required to pay the union fees before she could begin working for Lakeside. There is some dispute whether the SAG representative told Lakeside's casting director that petitioner had to "join" or had to "pay" the union; regardless, petitioner understood from the casting director that she had to pay SAG before she could work for Lakeside. Petitioner called SAG's local office and learned that the fees that she would have to pay to join the union would be around $500.

Over the next few days, petitioner attempted to negotiate an agreement with SAG that would allow her to pay the union fees after she was paid for her work by Lakeside. When these negotiations failed to produce an acceptable compromise and petitioner had not paid the required fees by the day before her part was to be filmed, Lakeside hired a different actress to fill the part. At some point after Lakeside hired the new actress, SAG faxed a letter to Lakeside stating that it had no objection to petitioner working in the production. The letter was too late for petitioner; filming proceeded on schedule with the replacement actress.

40

Petitioner filed suit against Lakeside and SAG alleging, among other things, that SAG had breached the duty of fair representation. According to petitioner, SAG had breached its duty by negotiating and enforcing a union security clause with two basic flaws. First, the union security clause required union "membership" and the payment of full fees and dues when those terms could not be legally enforced under *General Motors* and *Beck*. Petitioner argued that the collective bargaining agreement should have contained language, in addition to the statutory language, informing her of her right not to join the union and of her right, under *Beck*, to pay only for the union's representational activities. Second, the union security clause contained a term that interpreted the 30-day grace period provision to begin running with any employment in the industry. According to petitioner, this interpretation of the grace period provision contravened the express language of §8(a)(3), which requires that employees be given a 30-day grace period from the beginning of "such employment." She interprets "such employment" to require a new grace period with each employment relationship. Finally, in addition to these claims about the language of the union security clause, petitioner alleged that SAG had violated the duty of fair representation by failing to notify her truthfully about her rights under the NLRA as defined in *Beck* and *General Motors*.

The District Court granted summary judgment to the defendants on all claims, ruling first that SAG did not breach the duty of fair representation by negotiating the union security clause. App. to Pet. for Cert. 28a–29a. The court also determined that no reasonable factfinder could conclude that SAG had attempted to enforce the union security clause beyond the lawful limits. *Id.*, at 30a. Finally, the court ruled that petitioner's challenge to the grace period provision was actually an unfair labor practice claim, and thus it was preempted by the exclusive jurisdiction of the NLRB. *Id.*, at 31a.

Petitioner appealed, and the Court of Appeals for the Ninth Circuit affirmed in part and reversed in part. 124 F. 3d 1034 (1997). The Court of Appeals reversed the grant of summary judgment on petitioner's claim that SAG's enforcement of the union security clause breached the duty of fair representation, finding that there were genuine issues of material fact remaining to be resolved on this issue. For example, the record contains conflicting evidence on whether the union told petitioner that she had to "join" the union, or whether it told her that she had to "pay" the union. *Id.,* at 1041. The Court of Appeals also reversed the grant of summary judgment on petitioner's claim that the union had breached the duty of fair representation by failing to notify her of her right, under *Beck,* to pay only the lesser "core" fees associated with the union's collective bargaining functions. The District Court had not addressed this claim, so the Court of Appeals remanded this issue for consideration. *Id.,* at 1042–1043.

On the two issues before this Court, however, the Court of Appeals affirmed the judgment of the District Court. First, the court held that SAG had not breached the duty of fair representation merely by negotiating a union security clause that tracked the language of the NLRA. The court noted that the statutory language had been given a specialized meaning, but rejected petitioner's argument that the failure to fully explain this meaning in the collective bargaining agreement was an arbitrary or bad faith breach of the duty of fair representation. The court noted that two other Courts of Appeals had recently rejected similar claims. *Id.,* at 1038–1039 (citing *International Union Electronic, Electrical, Salaried, Machine and Furniture Workers* v. *NLRB,* 41 F. 3d 1532 (CADC 1994); *Nielsen* v. *International Assn. of Machinists & Aerospace Workers,* 94 F. 3d 1107 (CA7 1996), cert. denied, 520 U. S. 1165 (1997)). The Ninth Circuit's resolution of this issue is in tension with the decisions of two other Courts of Appeals. See, *e. g., Buzenius* v.

*NLRB*, 124 F. 3d 788 (CA6 1997), cert. pending, No. 97–945; *Bloom* v. *NLRB*, 30 F. 3d 1001 (CA8 1994).

Second, the Court of Appeals affirmed the District Court's judgment that it did not have jurisdiction over petitioner's challenge to the grace period provision. The court acknowledged that federal courts have jurisdiction over duty of fair representation claims, but, noting our admonishment in *Beck* not to be deceived by a plaintiff's attempt to disguise an unfair labor practice claim as a fair representation claim, *Communications Workers* v. *Beck*, 487 U. S., at 743, the court held that petitioner's claim was not a fair representation claim. According to the court, the statutory question presented by petitioner's challenge to the grace period provision was the central issue for resolution, and under these circumstances, the claim fell within the exclusive jurisdiction of the NLRB. 124 F. 3d, at 1039–1041.

We granted certiorari to resolve the conflict over the facial validity of a union security clause that tracks the language of § 8(a)(3), and to clarify the standards for defining the primary jurisdiction of the NLRB. 523 U. S. 1019 (1998).

## II

### A

This case presents a narrow question: Does a union breach its duty of fair representation merely by negotiating a union security clause that tracks the language of § 8(a)(3)? To understand why this is a narrow question, it is helpful to keep in mind what issues we are *not* resolving in this case. First, we are not deciding whether SAG illegally enforced the union security clause to require petitioner to become a member of the union or to require her to pay dues for noncollective bargaining activities. Petitioner's complaint includes a claim that the union breached the duty of fair representation by enforcing the clause illegally, but that claim is not before us. The Court of Appeals held that there were factual disputes that precluded the grant of summary

judgment on this issue, and so this claim was remanded to the District Court for further proceedings. 124 F. 3d, at 1041–1042. Second, we are not deciding whether SAG breached its duty of fair representation by failing to adequately notify petitioner of her rights under *Beck* and *General Motors*. The Board has held (and SAG concedes, see Brief for Respondent Screen Actors Guild 35–36) that unions have an obligation to notify employees of their *Beck* rights. See *United Paperworkers Int'l Union (Weyerhaeuser Paper)*, 320 N. L. R. B. 349 (1995), rev'd on other grounds *sub nom. Buzenius* v. *NLRB, supra; California Saw and Knife Works*, 320 N. L. R. B. 224 (1995), enf'd *sub nom. International Association of Machinists & Aerospace Workers* v. *NLRB*, 133 F. 3d 1012 (CA7), cert. denied *sub nom. Strang* v. *NLRB, post*, p. 813. See also *Nielsen* v. *International Assn. of Machinists & Aerospace Workers, supra*, at 1114–1115 (recognizing such a duty on part of union); *Abrams* v. *Communications Workers of America*, 59 F. 3d 1373, 1378–1380 (CADC 1995) (same). The Board is currently in the process of defining the content of the notification right to give guidance to unions about what they must do to notify employees about their rights under *Beck* and *General Motors. California Saw and Knife Works, supra; United Paperworkers Int'l Union, supra*. Petitioner's suit alleges that SAG failed to notify her of her *Beck* and *General Motors* rights, but this claim, too, is not before us. The Court of Appeals remanded this claim to the District Court for reconsideration. 124 F. 3d, at 1042–1043.

With this background, the question we are resolving comes into sharper focus. There is no disagreement about the substance of the union's obligations: If a union negotiates a union security clause, it must notify workers that they may satisfy the membership requirement by paying fees to support the union's representational activities, and it must enforce the clause in conformity with this notification. The only question presented by this case is whether a union breaches the

duty of fair representation merely by negotiating a union security clause that uses the statutory language without expressly explaining, in the agreement, the refinements introduced by our decisions in *General Motors* and *Beck.* To rephrase the question slightly, petitioner's claim is that even if the union has an exemplary notification procedure and even if the union enforces the union security clause in perfect conformity with federal law, the mere negotiation of a union security clause that tracks the language of the NLRA breaches the duty of fair representation. We hold that it does not.

## B

When a labor organization has been selected as the exclusive representative of the employees in a bargaining unit, it has a duty, implied from its status under § 9(a) of the NLRA as the exclusive representative of the employees in the unit, to represent all members fairly. See, *e. g., Ford Motor Co.* v. *Huffman,* 345 U. S. 330, 337 (1953); *Vaca* v. *Sipes,* 386 U. S. 171, 177 (1967). As we described this duty in *Vaca* v. *Sipes,* the duty of fair representation requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Ibid.* In other words, a union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith. *Id.,* at 190. See also *Air Line Pilots* v. *O'Neill,* 499 U. S. 65, 67 (1991) (reaffirming this tripartite standard). In this case, petitioner does not argue that SAG's negotiation of the union security clause was discriminatory, so we only consider whether SAG's conduct was arbitrary or in bad faith.

Petitioner argues that in *Beck,* we redefined the standard for evaluating when a union's conduct is "arbitrary." Petitioner reads our decision in *Beck* to hold that the union's conduct was arbitrary *merely* because its actions violated the statute. According to petitioner, because we did not

elaborate on our conclusion that the union's statutory violation was a breach of the duty of fair representation, we must have concluded that it was "arbitrary." Brief for Petitioner 12. Under this reading, the "arbitrary" prong of the duty of fair representation standard is equated with "statutory violation." This is an inaccurate reading of our decision in *Beck*. It is true that the focus of our attention in *Beck* was whether the union's conduct was consistent with § 8(a)(3) and that once we found that it was inconsistent with the statute, we did not tarry to explain how this conduct breached the duty of fair representation. But we did not hold that the finding of a mere statutory violation was sufficient to support a conclusion that the union breached its duty. In *Beck*, the union collected fees and dues from bargaining unit employees under its statutory grant of authority to serve as the exclusive bargaining representative. But then it used that money for purposes wholly unrelated to the grant of authority that gave it the right to collect that money, and in ways that were antithetical to the interests of some of the workers that it was required to serve. 487 U. S., at 743–744. It was this latter aspect of the union's conduct, and not just the fact that the conduct violated the statute, that made the union's actions a breach of the duty of fair representation.

That our holding in *Beck* did not alter the standard for finding conduct "arbitrary" is confirmed by our decision in *Air Line Pilots*. In that case, decided three years after *Beck*, we specifically considered the appropriate standard for evaluating conduct under the "arbitrary" prong of the duty of fair representation. We held that under the "arbitrary" prong, a union's actions breach the duty of fair representation "only if [the union's conduct] can be fairly characterized as so far outside a 'wide range of reasonableness' that it is wholly 'irrational' or 'arbitrary.'" 499 U. S., at 78 (quoting *Ford Motor Co.* v. *Huffman, supra,* at 338). This "wide range of reasonableness" gives the union room to make discretionary decisions and choices, even if those judgments are

ultimately wrong. In *Air Line Pilots*, for example, the union had negotiated a settlement agreement with the employer, which in retrospect proved to be a bad deal for the employees. The fact that the union had not negotiated the best agreement for its workers, however, was insufficient to support a holding that the union's conduct was arbitrary. 499 U. S., at 78–81. A union's conduct can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation. *Ibid.*

Under this standard, SAG's negotiation of a union security clause with language derived from the NLRA section authorizing such a clause is far from arbitrary. Petitioner argues that it is irrational to negotiate a clause that cannot be enforced as written. But this clause *can* be enforced as written, because by tracking the statutory language, the clause incorporates all of the refinements that have become associated with that language. When we interpreted § 8(a)(3) in *General Motors* and *Beck*, we held that the section, fairly read, included the rights that we found. To the extent that these interpretations are not obvious, the relevant provisions of § 8(a)(3) have become terms of art; the words and phrasing of the subsection now encompass the rights that we announced in *General Motors* and *Beck*. After we stated that the statutory language incorporates an employee's right not to "join" the union (except by paying fees and dues) and an employee's right to pay for only representational activities, we cannot fault SAG for using this very language to convey these very concepts.

Petitioner also invites us to conclude that the union's conduct in negotiating the union security clause breached the duty of fair representation because it was done in bad faith. She argues that the negotiation of this clause was in bad faith because the union had no reason to use the statutory language except to mislead employees about their rights under *Beck* and *General Motors*. This argument has two components: that the union intended to mislead workers, and

that the union had no other purpose but to mislead. Both claims are unpersuasive. To understand why her first claim is unconvincing, it is again helpful to recall the nature of the claim being asserted here. Petitioner's argument is not that SAG chose to use this language in the collective bargaining agreement after determining that the use of this language in the contract would deceive a large number of workers. Her argument is more ambitious. According to petitioner, even if the union always informs workers of their rights and even if it enforces the union security clause in conformity with federal law, it is bad faith for a union to use the statutory language in the collective bargaining agreement because such use can only mislead employees. Petitioner's argument fails because it is so broad. It is difficult to conclude that a union acts in bad faith by notifying workers of their rights through more effective means of communication and by using a term of art to describe those rights in a contract workers are unlikely to read. Under these circumstances, there is no intent to mislead, so the first part of petitioner's "bad faith" argument fails.

The second part of petitioner's bad faith argument—that there was no other reason for the union's choice of the statutory language—also fails. The statutory language, which we have said incorporates all of the refinements associated with the language, is a shorthand description of workers' legal rights. A union might choose to use this shorthand precisely *because* it incorporates all of the refinements. Petitioner argues that this reason for failing to explain all of the intricate rights and duties associated with a legal term of art is bad faith. The logic of petitioner's argument has no stopping point; it would require unions (and all other contract drafters) to spell out all the intricacies of *every* term used in a contract. Contracts would become massive and unwieldy treatises, yet there would be no discernible benefit from the increased mass. Because there is no stopping point to the logic of petitioner's argument, we find it unper-

48

suasive. Contrary to petitioner's claim, we conclude that it may be perfectly reasonable for a union to use terms of art in a contract.

Petitioner proposed one stopping point at oral argument: the union security clause. Petitioner suggested that a union is only required to explain the union security clause in intricate detail because that is the only part of the contract where the union's and the workers' interests diverge. Tr. of Oral Arg. 16. The union security clause, however, is not the only part of the contract where the union's interests diverge from the interests of the employees. To take a simple example, the union's duty of fair representation is implied from its status as the exclusive bargaining representative of the bargaining unit workers. Under petitioner's logic, the union would have to incorporate into the collective bargaining agreement a section detailing the union's obligations under this duty. Presumably, this section would have to include discussions of judicial and NLRB interpretations of each prong of the duty of fair representation and how those prongs limit union conduct toward employees. Moreover, petitioner's rights under *Beck* and *General Motors* are not the only limits on a union's power under a union security clause. For example, the NLRA provides that workers with religious objections to supporting unions cannot be forced to pay *any* fees to a union, 29 U. S. C. § 169, and it also provides that the workers cannot be forced to pay fees that are discriminatory or excessive, § 158(b)(5). In other words, petitioner's proposed stopping point is no stopping point at all. A union's decision to avoid this slippery slope is not *a fortiori* a decision made in bad faith.

In sum, on this record, the union's conduct in negotiating a union security clause that tracked the statutory language cannot be said to have been either arbitrary or in bad faith. The Court of Appeals correctly rejected petitioner's argument that, by negotiating this clause, the union breached its duty of fair representation.

## III

The Court of Appeals also correctly refused to exercise jurisdiction over petitioner's challenge to the 30-day grace period provision of the union security clause. Petitioner argues that all duty of fair representation claims are cognizable in federal court, and that because she couched her claim as a breach of the duty of fair representation, her claim by definition can be heard in federal court. Brief for Petitioner 24–25. For this proposition, petitioner relies on *Breininger* v. *Sheet Metal Workers,* 493 U. S. 67 (1989). Petitioner's starting point correctly describes the law. When a plaintiff challenges an action that is "arguably subject to § 7 or § 8 of the [NLRA]," this challenge is within the primary jurisdiction of the NLRB. *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 245 (1959). These claims are within the primary jurisdiction of the NLRB in part to promote the uniform interpretation of the NLRA. *Id.,* at 242–243. But when a plaintiff alleges a breach of the duty of fair representation, this claim is cognizable in the first instance in federal court. *Vaca* v. *Sipes,* 386 U. S., at 177–183; *Breininger* v. *Sheet Metal Workers, supra,* at 73–84. In *Breininger,* we rejected the invitation to create exceptions to this rule based on the expertise of the NLRB, the subject matter of the complaint, or the presence of any other factor. 493 U. S., at 75–77. Thus, petitioner is on solid ground to argue that if her challenge to the grace period provision is a duty of fair representation claim, the lower courts erred in refusing to exercise jurisdiction over that claim.

The qualification—*if* her challenge is a duty of fair representation claim—is important. The ritualistic incantation of the phrase "duty of fair representation" is insufficient to invoke the primary jurisdiction of federal courts. As we noted in *Beck,* "[e]mployees . . . may not circumvent the primary jurisdiction of the NLRB simply by casting statutory claims as violations of the union's duty of fair representation." 487 U. S., at 743. When a plaintiff's only claim is

that the union violated the NLRA, the plaintiff cannot avoid the jurisdiction of the NLRB by characterizing this alleged statutory violation as a breach of the duty of fair representation. To invoke federal jurisdiction when the claim is based in part on a violation of the NLRA, there must be something *more* than just a claim that the union violated the statute. The plaintiff must adduce facts suggesting that the union's violation of the statute was arbitrary, discriminatory, or in bad faith.

This does not mean that federal courts cannot resolve statutory issues under the NLRA in the first instance. Although federal district courts cannot resolve pure statutory claims under the NLRA, they can resolve statutory issues to the extent that the resolution of these issues is necessary for a decision on the plaintiff's duty of fair representation claim. *Ibid.* (quoting *Connell Constr. Co.* v. *Plumbers,* 421 U. S. 616, 626 (1975)). Thus in *Beck,* we resolved the statutory question because it was collateral to the duty of fair representation claim, and that claim was independently within the jurisdiction of the federal courts. 487 U. S., at 743–744. The power of federal courts to resolve statutory issues under the NLRA when they arise as collateral matters in a duty of fair representation suit does not open the door for federal court first instance resolution of all statutory claims. Federal courts can only resolve § 7 and § 8 claims that are collateral to a duty of fair representation claim.

Applying these principles in this case, petitioner's challenge to SAG's grace period provision falls squarely within the primary jurisdiction of the NLRB. Her claim is that SAG employed a term in the collective bargaining agreement that was inconsistent with the NLRA. This allegation, although framed by the recitation that this act breached the duty of fair representation, is at base a claim that SAG's conduct violated § 8(a)(3). This claim is not collateral to any independent basis for federal jurisdiction; there are no facts alleged suggesting that this violation was arbitrary, discrimi-

natory, or in bad faith. Petitioner argues that the term is misleading because it misrepresents the employee's obligations as stated in the NLRA, but this transparent attempt to avoid the jurisdiction of the NLRB is unconvincing. This term is not misleading; the only question is whether the term is consistent with federal law. Because petitioner's only argument is that the term is inconsistent with § 8(a)(3), her claim falls within the primary jurisdiction of the NLRB.

Petitioner attempts to avoid this conclusion by arguing that her challenge to the grace period provision is structurally identical to the duty of fair representation claim considered in *Beck* and to the duty of fair representation claim considered in the first part of this opinion. Brief for Petitioner 24–25. Thus, according to petitioner, because these claims were cognizable in federal trial court, so is her challenge to the grace period provision. But in *Beck* it was the union that relied on § 8(a)(3) as a defense to the plaintiffs' claim that it breached the duty of fair representation. When a claim that a union has breached its duty of fair representation is based in part on an alleged violation of the NLRA, it must be independently supported by some allegations describing arbitrary, discriminatory, or bad faith union conduct. Thus, as we described above, in *Beck*, the duty of fair representation claim was not premised on the mere unlawfulness of the union's conduct. The basis for the fair representation claim was that the union's conduct was arbitrary and possibly in bad faith. Petitioner's challenge to the membership and fees requirements of the union security clause is similarly distinguishable from her challenge to the grace period provision. The claim we considered in the first part of the opinion was that the union's negotiation of the union security clause breached the duty of fair representation because it was arbitrary and in bad faith for the union to negotiate a clause that might mislead employees. This claim, like the claim considered in *Beck*, is not solely about the interpretation of the statute. Petitioner's challenge to

the grace period provision, by contrast, is at most an allegation that the union violated the statute. This claim is quintessentially an issue for resolution by the NLRB, and the Court of Appeals correctly refused to uphold District Court jurisdiction over it.

Accordingly, the judgment of the United States Court of Appeals for the Ninth Circuit is affirmed.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE THOMAS joins, concurring.

I join the opinion of the Court and offer these further observations.

First, the opinion does not address circumstances in which there is evidence that a security clause such as this one was used or intended to deceive or injure employees. Our sole conclusion is that mere recitation of the statutory language within a security clause does not, without more, violate the duty of fair representation. The Court of Appeals in this case understood that the record, on further development at trial, might support a finding that the union misinformed the petitioner of her membership obligations. The wording of the clause might well have some bearing on that determination. The Court of Appeals' remand for trial on the union's conduct toward the petitioner is not before us. As the issue is not addressed, our opinion is not inconsistent with the Court of Appeals' ruling. There is also a suggestion in the record, see, *e. g.,* App. 34–35, that the security clause in this case may have been used or intended to mislead a potential employer to the petitioner's detriment. If further developed, evidence to this effect would likely be relevant to the claim that remains for trial; our opinion should not be misunderstood to suggest otherwise.

The security clause at issue required, as conditions of employment, "member[ship] in good standing," *id.,* at 28, and payment of "the periodic dues and the initiation fee uni-

formly required as a condition of acquiring or retaining membership in the Union," *id.*, at 29. As recognized by other courts and by members of the National Labor Relations Board, language like this can facilitate deception. See, *e. g., Bloom* v. *NLRB*, 153 F. 3d 844, 850–851 (CA8 1998) ("As Bloom can well attest, when an employee who is approached regarding union membership expresses reluctance, a union frequently will produce or invoke the collective bargaining agreement . . . . The employee, unschooled in semantic legal fictions, cannot possibly discern his rights from a document that has been designed by the union to conceal them. In such a context, 'member' is not a term of 'art,' . . . but one of deception"); *Wegscheid* v. *Local 2911, Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers*, 117 F. 3d 986, 990 (CA7 1997) ("[T]he only realistic explanation for the retention of the statutory language in collective bargaining agreements . . . is to mislead employees about their right not to join the union"); *Monson Trucking, Inc.*, 324 N. L. R. B. No. 149, pp. 6–8 (Chairman Gould, concurring) ("[A] collective-bargaining agreement that speaks in terms of 'membership' or 'membership in good standing' without further definition misleads employees into believing that they can be terminated if they do not become formal, full-fledged union members"). As I understand the Court's opinion, there is no basis in our holding today for an inference that inclusion of the statutory language is somehow a defense when a violation of the fair-representation duty has been alleged and facts in addition to the bare language of the contract have been adduced to show the violation. Rather, our holding reflects only the conclusion that the negotiation of a security clause containing such language does not necessarily, or in all circumstances, violate this duty.

Furthermore, we do not have before us the question whether use of this language, in some circumstances, might be an unfair labor practice, even though, without more, it is not a breach of the duty of fair representation. As the

Court's opinion makes clear, a claim for breach of the duty of fair representation in circumstances such as those presented here, unlike an unfair-labor-practice claim, must be predicated on more than a simple violation of the National Labor Relations Act.

These issues are matters yet to be determined.