**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 18 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

NATIONAL LABOR RELATIONS
BOARD,

     Petitioner,

v.

    No. 01-9516

OKLAHOMA FIXTURE COMPANY,

     Respondent.

---

**ON REHEARING EN BANC FROM AN APPLICATION**
**FOR ENFORCEMENT OF AN ORDER FROM THE**
**NATIONAL LABOR RELATIONS BOARD**
**(Nos. 17-CA-18734 and 17-CA-19036)**

---

Ruth E. Burdick, Attorney, (David Habenstreit, Supervisory Attorney, Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, with her on the brief) of the National Labor Relations Board, Washington, D.C., for Petitioner.

D. Kevin Ikenberry, (Stephen L. Andrew, with him on the briefs) of Stephen L. Andrew & Associates, A Professional Corporation, Tulsa, Oklahoma, for Respondent.

---

Before **TACHA**, Chief Judge, **SEYMOUR**, **EBEL**, **KELLY**, **HENRY**, **BRISCOE**, **LUCERO**, **MURPHY**, **HARTZ**, **O'BRIEN** and **McCONNELL**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

_____

The National Labor Relations Board (Board) seeks an order enforcing its determination that Oklahoma Fixture Company did not violate section 302 of the Labor Management Reporting Act, 29 U.S.C. § 186[1] by deducting permit fees from employee paychecks and remitting them to the union, and therefore that the company violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1), by unilaterally discontinuing that practice. A panel of this court held that the statutory phrase "membership dues" at issue in the Board decision is unambiguous, declined to defer to the Board's construction of section 302, and denied enforcement. *NLRB v. Okla. Fixture* Co., 295 F.3d 1143 (10th Cir. 2002). We granted the Board's request for rehearing en banc and now determine that under governing Supreme Court authority, the statute is ambiguous, the Board's interpretation is reasonable, and the Board's order should be enforced.

_____

[1] Section 302(a) provides: "It shall be unlawful for any employer . . . to pay, lend, or deliver, or agree to pay, lend or deliver, any money or other thing of value (1) to any representative of any of his employees . . . or (2) to any labor organization . . . ." 29 U.S.C. § 186(a). Section 302(b) prohibits labor organizations from demanding such payments from employers. *Id.* § 186(b).

# I

Section 302 criminalizes money payments between employers and unions but provides various exceptions for payments related to legitimate business between those entities. Under one of these exceptions, section 302(c)(4), employers may forward to the union payments of "membership dues" deducted from employees' paychecks pursuant to their authorization cards.[2]

The employees in this case are probationary workers in their first ninety days of employment, during which time they are not required by the collective bargaining agreement (CBA) to join the union. These employees nevertheless were required to pay permit fees to the union after their first thirty days of employment. *See Oklahoma Fixture Co.*, 331 NLRB 1116, 1122 (2000). They made these payments pursuant to a "check-off " provision: in other words, they signed cards authorizing their employer, Oklahoma Fixtures Company, to deduct the amount of the permit fees (or any other fees) from their paychecks and forward this amount to the union.[3] Oklahoma Fixtures participated in this check-

---

[2] Section 302(c)(4) provides that the section does not apply "with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment." 29 U.S.C. § 186(c)(4).

[3] We note that whether particular payments may be required as membership dues under section 8(a)(3) is an entirely separate issue from whether they are a permissible subject of check-off under section 302(c)(4). *See, e.g., NLRB v. Food*

(continued...)

off process for eight years until it was advised by counsel to cease, which it did without consulting the union. As a result, the union filed unfair labor practice charges against the company.

The issue in this case is whether Oklahoma Fixtures engaged in criminal conduct as defined under section 302 by forwarding these employees' permit fees to their union, or whether forwarding such payments constituted non-criminal conduct under the section 302(c)(4) exception for "membership dues." The Board determined that the permit fees at issue here are "membership dues" and therefore excepted from the criminal provision. *Okla. Fixture Co.*, 331 NLRB 1116, 1120-22 (2000). The Board observed that the Department of Justice, which is the agency responsible for enforcing section 302, the Board itself, and numerous courts have consistently interpreted "membership dues" broadly to include initiation fees and other assessments of employees by their unions, as well as agency fees paid by nonmembers. The Board determined that the permit fees are analogous to dues, noting that probationary employees are members of the collective bargaining unit and are therefore legitimate subjects of service fees for

---

[3](...continued)
*Fair Stores, Inc.*, 307 F.2d 3, 12 (3d Cir. 1962); *Grajczyk v. Douglas Aircraft Co.*, 210 F. Supp. 702, 705-06 (S.D. Cal. 1962) (holding that check-off for agency fees does not violate section 302 but noting "[w]hether or not the agreement by which [check-off for agency fees] was brought about is an unfair labor practice or otherwise unlawful is quite a different question . . ."). The section 8(a)(3) question has not been raised in the case before us.

the union's representation even though they are not required to be union members. On this basis, the Board concluded the permit fees are permissible "membership dues" under section 302. Oklahoma Fixtures appealed. Sitting en banc, we enforce the Board's order.

## II

As the Supreme Court noted in *Holly Farms Corp. v. NLRB*, 517 U.S. 392 (1996):

> If a statute's meaning is plain, the Board and reviewing courts "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). When the legislative prescription is not free from ambiguity, the administrator must choose between conflicting reasonable interpretations. Courts, in turn, must respect the judgment of the agency empowered to apply the law "to varying fact patterns," [*Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 304 (1977)], even if the issue "with nearly equal reason [might] be resolved one way rather than another, *id.* at 302 (citing [*Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 770 (1949)] (Frankfurter, J., concurring)).

*Id.* at 398-99. Under the *Chevron* line of cases, therefore, if the statutory phrase in a labor statute is ambiguous, we usually defer to the Board's reasonable interpretation of it. We are dealing here with a criminal provision, however, and it is not entirely clear exactly how the *Chevron* analysis is affected by the presence of criminal liability in a statute being interpreted by an agency. The Supreme Court has held that "some degree of deference" is owed to an agency's interpretation of a criminal provision, although the degree of deference may be

dependent upon considerations of the agency's particular expertise and the policies implicated by the criminal statute in question, as well as the extent to which Congress has charged the agency with administering the criminal statute. *See Babbitt v. Sweet Home Chapter of Cmties. for a Greater Ore.*, 515 U.S. 687, 703-04 & n.18 (1995), citing Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 ADMIN. L. REV. 363, 372-73 (1986); *see also Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, No. 01-5066, 2003 WL 1889944 (April 17, 2003) (determining "no deference" owed to National Indian Gaming Commission's construction of Johnson Act because United States Department of Justice, rather than NIGC, is charged with administering statute).[4]

Here, there is a need for a uniform national understanding of the meaning of the statute in question from a labor law standpoint, and the Board has special expertise regarding the labor law implications of the statute. If we determine the statute is ambiguous, therefore, it is appropriate to afford some deference to the

---

[4] Legal scholarship indicates a split of opinion on deference to an agency's interpretation of a criminal statute. *Compare* Sanford N. Greenberg, *Who Says it's a Crime?: Chevron Deference to Agency Interpretations of Regulatory Statutes that Create Criminal Liability*, 58 U. PITT. L. REV. 1 (1996) (arguing against criminal liability exception to *Chevron*) *with* Mark D. Alexander, Note, *Increased Judicial Scrutiny for the Administrative Crime*, 77 CORNELL L. REV. 612 (1992) (arguing for criminal liability exception to *Chevron*); *see also* Cass R. Sunstein, *Law and Administration After Chevron*, 90 COLUM. L. REV. 2071 (1990) (advocating a more curtailed application of *Chevron*); Cynthia R. Farina, *Statutory Interpretation and the Balance of Power in the Administrative State*, 89 COLUM. L. REV. 452 (1989) (advocating wholesale rejection of *Chevron*).

Board interpretation as long as it is a reasonable or permissible one, and not in conflict with interpretive norms regarding criminal statutes.[5]

## III

Prior constructions of the phrase "membership dues" by the Supreme Court and other circuits persuade us that the meaning of the phrase as used in section 302 is not plain.[6] For example, the Supreme Court has held in a different context that payments other than those by actual union members can constitute "membership dues" under labor statutes. *See NLRB v. General Motors Corp.*, 373 U.S. 734 (1963); *see also Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33 (1998). These cases considered the treatment of "dues" under section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a), which makes it unlawful for an employer to pay employees in an attempt to influence their decisions

---

[5] It is a general rule of statutory interpretation that criminal statutes must be construed narrowly, and that exceptions to those statutes must be construed broadly. *See United States v. Bass*, 404 U.S. 336 (1971).

[6] The panel majority relied on the collective bargaining agreement (CBA) as indicating that permit fees are not "membership dues" within the ambit of the statute. *See NLRB v. Okla. Fixtures* Co., 295 F.3d 1143, 1145-46 (10th Cir. 2002). However, the contractual meaning of the term "membership dues" in the CBA is irrelevant to the statutory interpretation issue. The statute itself, rather than the CBA, controls the meaning of the phrase in section 302.

regarding union membership.[7]  Membership "dues" was interpreted narrowly

under section 8(a)(3) because employees can be discharged for failing to pay

union membership dues.  Because section 8(a)(3) grants unions coercive power

over workers' employment, the term was interpreted narrowly to limit the scope

of that power.  *See General Motors*, 373 U.S. at 740-43.  Even so, the Supreme

Court has stated on more than one occasion that the "dues" in section 8(a)(3)

incorporates more than its literal meaning suggests.  *See Marquez*, 525 U.S. at 46;

*General Motors*, 373 U.S. at 742.  Thus, in construing section 8(a)(3) in *General*

*Motors* the Court held that agency fees, which are payments by non-members as

service fees to the union for the benefits of representation, constitute

"membership dues."  *General Motors*, 373 U.S. at 741-42.

While both section 8(a)(3) and section 302 are labor statutes and both

contain the term "dues," the prescriptions, purpose, and previous interpretations

of "dues" in each differ.  Section 8 is aimed at protecting employees from union

and employer coercion.  Section 8(a)(3) prohibits compulsory unionism but does

permit CBAs to require employees to compensate unions for representation.[8]  The

---

[7] The term used in section 8(a)(3) is actually "periodic dues" paid for "acquiring or maintaining membership" rather than "membership dues" as used in section 302.

[8] While probationary employees do not receive all the protections of the union contract, they are members of the collective bargaining unit and receive some of the benefits of such membership.  Therefore, while they might claim they

(continued...)

purpose of section 302, on the other hand, is to prevent corruption between unions and employers, not to cabin any coercive power of the union over employees. Unlike compulsory dues permitted under section 8(a)(3), section 302(c)(4) authorizes the company to deduct the permit fees at issue in this case only after employees submit authorization cards to this effect.

Section 302(c)(4) must be interpreted broadly because it concerns an exception to a criminal statute. *See NLRB v. Food Fair Stores, Inc.*, 307 F.2d 3, 12 (3d Cir. 1962) ("The broad construction granted in the administration of section 302 by the Department of Justice is consistent with the criminal character of the sanctions it embodies."). *See also Int'l Union of Mine Mill & Smelter Workers, Local 515 v. American Zinc, Lead & Smelter Co.*, 311 F.2d 656, 659 (9th Cir. 1963) (hereinafter "*American Zinc*"); *Grajczyk v. Douglas Aircraft Co.*, 210 F. Supp. 702, 704-06 (S.D. Cal. 1962). Consequently, it is highly unlikely that "dues" in section 8(a)(3) would encompass non-obvious interpretations and refinement but "dues" in section 302 would not. In other words, since periodic or

---

[8](...continued)
should pay lower dues based on receiving fewer benefits than more senior workers, it arguably does not violate section 8(a)(3) to require probationary employees to pay dues generally as long as they are not required to do so in the first thirty days of employment. *See* 29 U.S.C. § 158(a)(3) ("[N]othing in this sub-chapter . . . shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day . . .").

membership dues have been construed more narrowly in section 8(a)(3) than in section 302(c)(4), the fact that the term comprehends more than the literal meaning in section 8(a)(3) leads to the conclusion that it does so in section 302(c)(4) as well. The fact that the term "dues" is construed differently in the two statutes in itself strongly suggests that the meaning of "dues" is ambiguous rather than plain. Indeed, the Ninth Circuit has expressly held that the term "membership dues" in section 302(c)(4) is ambiguous. *American Zinc*, 311 F.2d at 660.

If the meaning of "membership dues" were plain, we would be required to accept its literal meaning. The literal meaning, however, would exclude agency fees which the Supreme Court has held are covered under section 8(a)(3), *General Motors*, 373 U.S. 734, and which undoubtedly fall within the section 302(c)(4) exception as well, *see Grajczyk*, 210 F. Supp. at 705-06. Oklahoma Fixture's argument that agency fees are *in fact* membership dues, rather than included in "dues" as a matter of statutory construction, is not convincing. Employees who opt not to join the union but instead pay agency fees in lieu of membership dues are not members of the union. They specifically pay agency fees so they will not have to become union members to maintain employment. The Supreme Court made this clear in *General Motors*, where its holding that agency fees are "membership dues" under section 8(a)(3) was based on two conclusions: the

statute "made significant alterations in the meaning of 'membership' for the purposes of union-security contracts," and this meaning incorporated the clear intent of Congress to permit union security agreements under that statute. *General Motors*, 373 U.S. at 742.

In light of all of these considerations, we conclude that the meaning of "membership dues" in section 302 is ambiguous.

**IV**

Having determined that the statutory language is not plain, we now turn, under *Chevron* and *Sweet Home Chapter*, to analysis of whether the Board's interpretation is reasonable. The Board's construction of "membership dues" is supported by a convincing rationale and easily meets the "reasonableness" standard we apply to Board interpretations of labor legislation. *See Holly Farms Corp.*, 517 U.S. at 409. The Board's rationale is supported by those cases upholding broad interpretations of the exceptions to section 302.

The Second Circuit held that a tax imposed over and above dues falls within section 302(c)(4). *See Schwartz v. Assoc. Musicians of Greater NY*, 340 F.2d 228, 233-34 (2d Cir. 1964). In doing so, the court reasoned that a narrow construction of the section is not consistent with the limited purpose of the statute, the taxes are similar to dues, it is irrelevant that the taxes were not

required as a condition of employment, and there is no other logical or practical reason the taxes should not be permitted under section 302. *Id.* In *American Zinc*, the Ninth Circuit held strike assessments to be a permissible subject of check-off under section 302. It noted the consistent positions of the Department of Justice and the Board on the meaning of "dues," which excludes "assessments" from section 8(a)(3) but not from section 302, and further noted that interpreting dues in section 302(c)(4) more broadly than in section 8(a)(3) is consistent with the different provisions and purposes of those two statutes. *American Zinc*, 311 F.2d at 659-60. Similarly, in *Food Fair Stores*, the Third Circuit upheld the Board's consistent position that strike assessments are "dues" under section 302 but not under section 8(a)(3) because the position is "not contrary to any clearly expressed legislative intent and [is] totally reasonable." *Food Fair Stores,* 307 F.2d at 16. Finally, in holding agency fees legal under section 302(c)(4) even though they do not fall within the literal interpretation of "membership dues," the court in *Grajczyk* reasoned that the prohibitions of the statute are directed at the relationship between the employer and the union, permitting agency fees is "thoroughly consistent" with the purpose of the statute, and there is no practical difference between agency fees and members' dues. *Grajczyk*, 210 F. Supp. at 705-06. The reasoning of these cases supports the conclusion that the permit fees at issue here fall under section 302(c)(4). They are not related to union-employer

corruption, they resemble dues paid by actual members, and it is consistent with the Board's long-standing position to so hold. *See Holly Farms Corp.*, 517 U.S. at 405-09.

Furthermore, case law instructs us that not only is the purpose of a particular payment relevant to determining whether it constitutes "dues," a "union security" purpose is a particularly relevant indication. The Supreme Court has noted with approval the Board's consideration of the purpose of payments made by members in determining whether those payments constitute "periodic dues" in section 8(a)(3). *Communications Workers of America v. Beck*, 487 U.S. 735, 752 n. 7 (1988); *see also Master Insulators v. Int'l Ass'n of Heat & Frost Insulators*, 925 F.2d 1118, 1122-23 (8th Cir. 1991); *Assoc. Builders & Contractors v. Carpenters Vacation and Holiday Trust Fund for N. Cal.*, 700 F.2d 1269, 1275 (9th Cir. 1983). The Court in *Beck* placed great importance specifically on a "union security" purpose in determining whether payments qualify as "dues," indicating that "union security" is the core legitimate purpose of dues themselves. There, the Court addressed whether unions could spend required agency fees on anything other than representation activities for the direct benefit of employees in the bargaining unit. While the Court decided that unions could not require employees they represent to pay for activities such as political organizing, the Court affirmed that dues unquestionably includes fees whose purpose is to

-13-

support union security.  *Beck*, 487 U.S. at 747-54.  The Court made it clear that "dues" has always included at least payments by employees who might otherwise be free riders – payments to compensate the union for its representation.  *Id.*  *General Motors* reflects a similar rationale.  The Court interpreted "dues" in section 8(a)(3) to include agency fees by construing "dues" to reflect Congress' intent to preserve union security agreements even though the term does not literally encompass agency fees.  *General Motors*, 373 U.S. at 740-44.

Here, probationary employees are a legitimate subject of union security because they are members of the bargaining unit and are covered by the CBA.  As noted above, unions are legally obligated to represent all employees in the bargaining unit, not just those who are union members.  Union security agreements allow unions to obtain "service fees," or dues-like compensation, from employees they are obligated to represent but who opt not to join the union.  The probationary employees are similarly a legitimate subject of union security because they are members of the bargaining unit, are covered by the CBA, and are owed a duty of fair representation like other members of the bargaining unit.[9]

_____

[9] Under the CBA, while the probationary employees do not obtain all of the benefits of the CBA, notably seniority rights and access to the grievance process, many of their work conditions are nevertheless products of the collective bargaining process, such as their rate of pay and on-the-job health and safety rules.  Whether the permit fee is the appropriate amount in light of the partial benefits probationary employees receive is a question of fair representation that is

(continued...)

*See, e.g., Hodges v. Atchison, Topeka & Santa Fe Ry. Co.*, 728 F.2d 414, 417 (10th Cir. 1984). Thus, the permit fees compensate the union for its representation of the probationary employees. In effect, membership dues are defined to cover all members of the bargaining unit rather than just members of the union. This is a rational way to interpret membership dues under section 302 because it is consistent with the inclusion of agency fees and, more generally, encompasses exactly those members of the unit to whom a union owes a duty of fair representation and from whom a union may legitimately collect service fees.

In conclusion, we hold that the term "membership dues" in section 302(c)(4) is ambiguous and that the Board's interpretation of that language to include the permit fees in this case is reasonable. Accordingly, we **ENFORCE** the Board's order.

---

[9](...continued)
not before us, but the fact that they receive some benefits under the CBA means they do receive representation from the union.

**No. 01-9516, <u>NLRB v. Oklahoma Fixture Co.</u>**

**BRISCOE**, Circuit Judge, concurring, with whom **HENRY**, Circuit Judge, joins:

I concur in the result reached by the majority. I write separately because I am not persuaded that any deference is owed to the Board's interpretation of the phrase "membership dues," as used in section 302(c)(4) of the National Labor Relations Act, 29 U.S.C. § 186(c)(4).

Section 302, although generally part of the Act, is a criminal statute. Its enforcement thus lies not with the Board, but presumably with the Department of Justice (DOJ). Indeed, in its order in this case, the Board noted that the DOJ was "the agency responsible for the enforcement of" section 302, and had "issued an influential opinion in 1948 construing the term 'membership dues' in" section 302(c)(4). NLRB Op. at 6. Further, the Board deferred to the DOJ's interpretation of section 302 in reaching its decision in this case.[1]

Nor are we obligated to defer to the DOJ's interpretation of section 302(c)(4). See <u>Crandon v. United States</u>, 494 U.S. 152, 177 (1990) (Scalia, J., concurring) ("[W]e have never thought that the interpretation of those charged

_____

[1] These factors, in my view, arguably distinguish this case from <u>Babitt v. Sweet Home Chapter of Cmties. for a Greater Ore.</u>, 515 U.S. 687 (1995), which involved the Secretary of Interior's interpretation of a statute, the Endangered Species Act of 1973 (ESA), that carried both civil and criminal penalties. Because the Secretary of Interior had enforcement authority over the civil penalty provisions of the ESA, it is understandable why some deference was owed to the Secretary's interpretation of that statute.

with prosecuting criminal statutes is entitled to deference.").  That leaves us to interpret section 302(c)(4) de novo, applying the applicable rules of statutory construction.

I agree with the majority that the term "membership dues," as used in section 302(c)(4), is ambiguous.  Given that conclusion, I would look to the legislative history of section 302 for guidance.  See generally Garcia v. United States, 469 U.S. 70, 76 n.3 (1984) (noting that "'[r]esort to legislative history'" is warranted "'where the face of the [statute] is inescapably ambiguous'") (quoting Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 395-96 (1951)).  Senator Taft, one of the authors of section 302, explained that the general prohibition set forth in section 302(a) was intended to apply to "a case of extortion or a case where the union representative is shaking down the employer." 93 Cong. Rec. 4746 (1947).  As for the exception set forth in section 302(c)(4), Taft explained that it "simply prohibit[s] a check-off made without any consent whatever by the employees."  Id.  In light of these statements, it appears that a broad construction of the section 302(c)(4) exception is warranted.

In addition, the rule of lenity arguably comes into play here since we are dealing with an ambiguous term in a criminal statute.  See Staples v. United States, 511 U.S. 600, 619 n.17 (1994) (noting rule of lenity requires that "ambiguous criminal statute[s] . . . be construed in favor of the accused").  Under

the rule of lenity, the exception set forth in section 302(c)(4) should be construed broadly to eliminate possible bases of criminal liability that do not violate the intent and purpose of the statute.

For these reasons, as well as those outlined in the majority opinion, I conclude the most reasonable construction of the term "membership dues" is the broad one long utilized by the Board and the DOJ.  Under that construction, it is permissible for respondent to deduct "permit fees" from the wages of probationary employees and forward them to the Union if the probationary employees have authorized the procedure.  As noted by the Board in its decision, the "permit fee" falls within the broad construction of the term "membership dues" because it (a) is "equal in amount to the monthly dues the Union charges its members," (b) resembles an initiation fee "because it represents an amount the [probationary] employee must pay the Union prior to becoming a member," and (c) "can reasonably be viewed as a charge to finance the cost of [the Union] representing the probationary employees, just as the Union charges dues to finance the cost of representing the regular employees."  NLRB Order at 7.

**01-9516 - <u>NLRB v. Oklahoma Fixture Company</u>**

**HARTZ**, Circuit Judge, concurring:

I concur in the opinion on the understanding that the permit fee was mandatory (although the fee could be checked off only with the employee's consent). This was the NLRB's view; its opinion below stated:

     1. "The Union has established a 'permit fee' to be paid by new employees in the 'inside' unit during the second and third months of their employment." 331 NLRB 1116, 1120.

     2. "[T]he permit fee resembles [an initiation] fee because it represents an amount the *employee must pay* the Union prior to becoming a member." *Id*. at 1122 (emphasis added).

**No. 01-9516, <u>National Labor Relations Board v. Oklahoma Fixture Co.</u>**

**KELLY**, Circuit Judge, dissenting.

No one, not the National Labor Relations Board ("Board"), not the parties and not even the court, posits that the "permit fees" in this case are membership dues. Counsel for the Board candidly admitted at oral argument that this was a first, particularly when the source of the authority for these fees is not contained in the record.[1] The court concludes that "membership dues" is ambiguous because "agency fees" have been included within the term, as well as initiation fees and other union assessments. Finding ambiguity, the court defers to the NLRB interpretation as reasonable, in no small part because that interpretation enhances union security, a conclusion that is unaddressed by the record but in any event could not override the statute. As the courts are charged with administering criminal statutes, not the Board, <u>Chevron</u> deference seems inappropriate. <u>See</u>

---

[1] The permit fees are not required by the collective bargaining agreement ("CBA"), but the NLRB determined that the employer's past practice of deducting the permit fees became an implied term of the CBA and that the probationary employees voluntarily executed authorizations for deductions of amounts equal to union dues. <u>Oklahoma Fixture Co.</u>, 331 NLRB 1116, 1120-21 (2000). In discussing why the permit fee resembled an initiation fee, the NLRB relied upon a prior case involving a document given to new employees describing the Union's "dues and permit structure." <u>Id.</u> at 1122 n.29 (quoting <u>Oklahoma Fixture Co.</u>, 305 NLRB 1077, 1078 (1992)). We usually decide cases based upon the record, not upon the record in some other case, although we have held that evidence outside the record may be considered in an unfair labor practice proceeding. <u>Beth Israel Hosp. & Geriatric Ctr. v. NLRB</u>, 688 F.2d 697, 699 (10th Cir. 1982) (en banc). This record lacks definitive evidence as to the source of authority for imposing the permit fees, as well as their mandatory character.

Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 844 (1984) (deference appropriate to "an executive department's construction of a statutory scheme it is entrusted to administer"); Crandon v. United States, 494 U.S. 152, 177 (1990) (Scalia, J.,  concurring in the judgment) (Chevron deference is inapplicable to criminal statutes because those statutes are enforced by courts); Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n, 327 F.3d 1019, ____ (10th Cir. 2003) ("Because the Johnson Act is a federal criminal statute enforced by the United States Department of Justice, we owe no deference to the NIGC's construction."); United States v. McGoff, 831 F.2d 1071, 1080 n.17 (D.C. Cir. 1987).  Even were some degree of deference appropriate as suggested by the court, no deference should be accorded an interpretation of the statute that disconnects the term "membership dues" from union membership or its practical equivalent.  The Board's interpretation is flawed because it fails to distinguish between cases involving employer payments of assessments against current union members (permissible) and payments of assessments against non-union members (impermissible).

In NLRB v. General Motors Corp., 373 U.S. 734 (1963), the Supreme Court determined that union membership may be a condition of employment only when "whittled down to its financial core," and so understood, agency fees are "the practical equivalent" of union membership.  Id. at 742-43.  Unlike agency fees,

the permit fees in this case are not reflective of the type of "membership" that consists of having the present ability to join the union, but merely paying one's union dues and assessments. See Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 37 (1998) (noting the term "membership" for purposes of § 8(a)(3) is satisfied "merely by paying to the union an amount equal to the union's initiation fees and dues"). The CBA makes it clear that the core financial obligation of union membership does not arise for probationary employees until the 91st day of employment.[2]

The permit fees in this case simply are not agency fees, initiation fees, service fees or assessments, or the practical equivalent. The probationary employees are not union members under the CBA, and there is no provision in the CBA for an agency fee; after all, we are dealing with a union shop. The probationary employees are excluded from certain benefits of union membership, including seniority status, resort to grievance procedures and paid holidays.

---

[2] The court faults the panel opinion for consulting the CBA in determining that permit fees are not membership dues. As the court observes, however, the purpose of a given payment is particularly instructive in determining whether such payment falls within the ambit of "membership dues" under § 302(c)(4). Maj. Op. § IV. The CBA is a reasonable source to which to look for the purpose of the permit fees. We do, after all, apply statutes to facts, and the CBA provides a factual foundation for the Union's purpose, or lack thereof, in collecting the permit fees. The lack of any discernible purpose is exactly what led the Board to use such expressions as "resembles," and "similar to" in attempting to locate a *post hoc* justification for the permit fees.

-3-

When they become union members, they still are required to pay an initiation fee. They have not consented to the withholding of anything akin to union dues; instead, desirous of employment, they are compelled to have the employer remit permit fees to the union prior to union membership. The fact that such payments may enhance union security (a test that would eviscerate any prohibition on payments by the employer to the union) has never been held to override at least some connection between "membership dues" and union membership.

With the exception of membership dues withheld pursuant to a written assignment, Congress generally has made it unlawful for any employer to pay any money to any labor organization. 29 U.S.C. § 186(a), (c)(4). Though the statute does not define "membership dues," the term has thus far, and ought to be, construed "as connoting a payment related to membership of *some kind*." NLRB v. Okla. Fixture Co., 295 F.3d 1143, 1146 (10th Cir. 2002). Congress could amend the Labor Management Relations Act to sever this link, but it has not done so. That must be the source of any change, for "[w]e do not sit as a 'superlegislature' to second-guess these policy choices." Ewing v. California, – U.S. – , 123 S.Ct. 1179, 1189 (2003). For these reasons, and those contained in the panel opinion, Okla. Fixture Co., 295 F.3d at 1144-47, I respectfully dissent.